ROSE RISKEN, Plaintiff and Respondent, *v.* NORTHERN
 PACIFIC RAILWAY COMPANY, a Corporation, Defend-
 ant and Appellant.

No. 9933.
Submitted December 1, 1959. Decided April 1, 1960.
350 P. (2d) 831.

58

John W. Bonner, Helena, argued orally for appellant.

John H. Risken, Helena, argued orally for respondent.

MR. CHIEF JUSTICE HARRISON delivered the Opinion of the Court.

This is an appeal by the defendant from a judgment entered on a jury verdict in favor of the plaintiff in an action for personal injuries.

Plaintiff alleged in her complaint that she had an operation in Minneapolis, Minnesota, which rendered her immobile in that she could not travel without assistance from others; that she departed from Minneapolis on November 11, 1955, on one of defendant's passenger trains bound for Butte, Montana; that defendant's agents or employees were advised of her condition and arrangements made for the presence of a wheel chair upon her arrival at her destination. She further alleged that upon her arrival at her destination on November 12th the train was late, the temperature below zero, the wheel chair not present, and plaintiff was required to remain in the open and exposed vestibule awaiting arrival of the wheel chair; further that on arrival of the wheel chair and while she was descending from the train with assistance, the defendant carelessly and negligently operated the train so as to cause it to move forward and she was thrown from the vestibule steps onto a person assisting her in alighting and by reason thereof her right leg, being the one upon which the operation had been performed, was severely and sharply twisted, causing sharp pain and the injuries complained of.

Defendant by answer generally denied all the allegations of the complaint, pleaded in its second, third and fourth separate affirmative defenses, the contributory negligence of plaintiff,

and as a further defense that the accident was unavoidable and an event of mischance and misfortune for which the defendant was not liable. All affirmative defenses pleaded were denied by plaintiff's reply.

By specifications of error, defendant contends that the verdict is contrary to the evidence in that plaintiff was guilty of contributory negligence as a matter of law and that the trial court erred in denying defendant's motion for nonsuit and its motion for a directed verdict. Error is also claimed in permitting an answer to be given to a hypothetical question, in giving certain instructions to the jury, and finally that the damages awarded by the jury were excessive and appeared to have been given under the influence of passion and prejudice.

In support of its position that the plaintiff was guilty of contributory negligence, the defendant argues that the complaint alleged that plaintiff twisted her leg as she was thrown from the vestibule steps of the train when the train was negligently and carelessly moved forward before plaintiff had alighted; that the evidence is to the effect that the train started smoothly and that nothing occurred in this act that would have disturbed the plaintiff's equilibrium; that the preponderance of the evidence is to the effect that the plaintiff alighted by throwing herself from the moving train; and that any injury she suffered was due to this imprudent act and therefore plaintiff was guilty of contributory negligence as a matter of law.

We have examined the record with care and will set forth a general statement thereof and go into particular detail with regard to the plaintiff alighting from the train.

Mrs. Rose Risken, accompanied by her husband, left Butte, Montana, on October 10, 1955, traveling on defendant's train, for Minneapolis, where plaintiff expected to undergo surgery. Such surgery was performed on October 14, for the replacement of the hip socket in the right hip with an artificial device. She was released from the hospital on November 11, and arrangements were made through plaintiff's husband for her return

transportation to Butte, Montana. She was carried upon the train, since she was unable to walk without assistance and crutches. She was immediately placed in bed on the train and remained there during her return trip to Butte, where she arrived at about 4:30 p. m. on November 12th. By use of her crutches, plaintiff traveled the short distance from her bedroom on the train to the vestibule, but upon arriving at that point a wheel chair which had been ordered from defendant was not available. The wheel chair had been requested by plaintiff's husband for use on arrival in Butte, and it appears that the telegraphic notice given by the defendant from its Minneapolis office to its Butte office requested the wheel chair for November 10th and while it was available on November 10th, it was not at trainside on November 12th, resulting in the necessity of obtaining it before Mrs. Risken could get off the train. Some person employed by the defendant took steps to secure the wheel chair. At this time the weather was cold outside and in the vestibule, and it appears that plaintiff waited for some minutes in the exposed vestibule before the chair arrived. When the chair was present, plaintiff started to get off the train with the assistance of her husband and it appears that Mr. Risken was holding her right arm and she was holding the railing with her left hand in going down the steps. During such descent down the steps of the car, and as she reached for the stepstool the train started to move forward. At this time, a friend of the family was on the depot platform and had offered to help and he was reaching up to assist Mrs. Risken to reach the stool. The plaintiff, at that time, as described by witnesses there present, was "half on and half off" the steps. As the friend who was assisting her to get off the train put it, "The train gave a lurch to the west at that time and Mrs. Risken was in my arms. I was on the west side of her, she was facing east, giving her assistance to get her on the main platform of the depot.

"Q. You caught her and saved her from falling? A. I did."

On cross-examination he testified:

"Q. Mr. Link, as I gathered from your evidence, Mrs. Risken was coming out of the train assisted by her husband. That right? A. Yes.

"Q. They came down the steps and you were there offering them assistance? A. Yes.

"Q. In your version of the accident the train started to move. Did you grab her or what? A. She lurched and I was to her left. She came down and she had her—I had her with this arm, around her back.

"Q. You were holding her at that time? A. I was holding her yes, when she came forward. She was about to step on that little box.

"Q. She came into your arms then? A. Yes.

"Q. She just started forward and came into your arms? A. I was standing to the left, generally to the west of the vestibule door.

"Q. Did Mr. Risken have hold of her too, at the same time you did? A. He was in back of her.

"Q. When she came forward, you held her? A. Yes.

"Q. Did you help put her in the wheel chair? A. Yes, I did."

Another witness who was on the depot platform testified:

"Q. Would you please tell us what you saw with regard to the accident that occurred? A. After we put our people on the train, we noticed Mr. Risken down the platform and walked down to say hello. I saw Mrs. Risken standing in the vestibule of the train, getting ready to get off. We talked to Law and he said they were waiting for a wheel chair. We had waited quite a while, standing there with them and Mrs. Risken started * * * just as Mrs. Risken started to get off of the train, the train moved ahead. Gus Link was standing there and he caught hold of Mrs. Risken.

"Q. He caught her? A. Yes.

"Q. Was she completely off the train when it started to move? A. No, she, was, I would say, half on and half off.

"Q. Did you hear the locomotive of that train sound a warning whistle? A. I don't recall that I did.

"Q. Did you hear anyone shouting 'All aboard?' A. No, I didn't."

In describing the situation, the husband of plaintiff testified as follows:

"Q. Now, what took place after the train stopped in Butte? A. Well, we had discussed about the best possible way to get my wife out of the train and into the wheel chair.

"Q. Who did you discuss this with? A. With her. I think the stewardess heard that too, but I am not sure. We agreed * * *

"Q. Go ahead! A. We agreed that she should hold onto the railing with her left hand and I would hold her under her right arm and shoulder to get down the steps.

"Q. First, how did she get from the bedroom to the vestibule of the car? A. She went out on her crutches and stood in the vestibule.

"Q. She made that herself? A. Yes, she stood at the top of the platform of the vestibule.

"Q. Did she go down the steps immediately? A. No.

"Q. Why? A. The wheel chair wasn't waiting there.

"Q. Now, is that the same wheel chair for which you had made arrangements in Minneapolis? A. Well, that is the one we expected.

"Q. What occurred at that time? A. Well, we saw there was no wheel chair. I remember I stepped down onto the platform and was a little exercised and the Stewardess discovered it and she made haste to go down to the depot to get one. She seemed to be disturbed about it too.

"Q. Did she say anything? A. Well, I don't recall all she said, she was going to get the wheel chair.

"Q. Did she go to get the wheel chair? A. Yes.

"Q. Could you estimate any way how long it was from the time the train stopped until the time the wheel chair was there? A. I would say it was about five minutes.

"Q. Who brought the wheel chair back from the station in Butte? A. The girl. Who brought it back to the train.

"Q. Who brought it back to the train? A. The girl, Miss McGough I believe it is.

"Q. Was there any one with her, do you recall? A. I don't recall but I don't think so. She went down alone to get it.

"Q. What took place after the wheel chair arrived at the vestibule entrance? A. Well, we prepared to go down the steps.

"Q. How did you do that? A. My wife took hold of the railing and I helped her. We went down there very carefully. In the meantime Mr. Link, whom we greeted at the station * * *

"Q. Who is he? A. Gus Link is a Butte man, a Butte architect. I greeted Mr. Link, Mr. Bob Henningsen and Rex Henningsen, all brothers-in-law who were down to see relatives off. Mr. Link asked me: 'Are you going out now, or coming in?' I mentioned that my wife and I were arriving, that she had had this operation and I was waiting to help her down the steps. He said: 'I will help you,' and stood by at the bottom of the steps. We had gone down the steps, I think we were on the last step of the coach. When my wife was stepping off, I believe with her right foot to reach the platform stool, the train just moved out very slowly. I was hardly aware of it for a moment. I had hold of her and she was off balance, I would say, and she was in state of being hurled, tossed, or thrown from the train. At that moment Mr. Link, who was there helping hollered: 'Let go and grab me,' or words to that effect.

"Q. What did you do? A. Well, then I saw her reaching to grab Mr. Link and I saw she was in his arms, so to speak, I let go, or released my grip of her, and when she was safely

off I managed to get off the train somehow. There was a few exciting seconds in there.

"Q. What happened after you alighted on the platform? A. Well, Mr. Link and I were helping my wife, and the station master—I think his name is Curry—was there and the stewardess was on the platform and between the bunch of us we placed her in the wheel chair."

Upon cross-examination he stated:

"Q. She had one foot, according to your version, on the step as I understood your testimony, the train started to move and she went forward into Mr. Link's arms. Is that about right? A. She was gradually being drawn off the train. I could feel the strain, holding her arm. I released that as the train was moving."

On December 1, 1955, statements were given by plaintiff and her husband to a claim agent of the defendant, and in such statement the husband stated: "My wife had her left foot on the last step of the coach and was trying to get the right one down reaching for the step box. I do not know if she had touched it or not. Then the train started to move. Mr. Gus Link had been standing on the platform, and he had volunteered to assist us. Link said to my wife 'let go and grab me'. I do not know exactly how she landed, but probably feel that she may have wrapped her arms around his neck. I was still on, but was able to get off in some manner. I believe that Link held my wife temporarily, and then finally she was set down into the wheel chair. The train was still going by when my wife stood on the platform. She did not fall to the ground. My wife did not fall from the train, but released her grip in order that Mr. Link might catch her."

In Mrs. Risken's statement she stated: "My husband came up, and I held onto the railing with my left hand while he assisted on my right. A friend of my husband's was on the platform, and he was helping from there. I was stepping cautiously, and the man on the platform said that I should throw

myself on him as the train was moving. I threw myself towards him, and in doing so I twisted my right knee. It was awfully tender anyhow. I did not fall, as the man on the platform caught me all right. Then my husband, the man with the chair, and the man who caught me, set me down in the wheel chair. I did not slip or fall from the train, but threw myself towards the man on the platform. The train kept right on moving, and left town, as it did not stop. * * *

"I had no warning that the train was starting. I did not hear any engine whistle sounded. The train moved out so smoothly that I could feel the hand rail pulling my arm away. I had one foot down, trying to get it on the step box, and the other still on the car when the train started to move."

As her Exhibit No. 15, plaintiff introduced the telegram from the Minneapolis to the Butte office of the defendant ordering the wheel chair for Mrs. Risken for arrival on November 10th, and as her Exhibit No. 14, she introduced a copy of the accident report to the Railroad Commission of Montana made and filed by the defendant, which advised the Railroad Commission that there had been an accident on November 12, 1955, at 4:10 p. m. at Butte in which one passenger was injured, and the general statement contained in the Exhibit as to the cause and circumstances attending the accident reads:

"Injured was psgr on train 25, engine 6510C, with 13 cars, westbound, and when she was stepping from last car step to stepbox, train started up, due to misunderstanding of signals, and when attempting to get into clear, she strained her knee. Weather clear, cold, daylight; no equipment or property defects."

Defendant's witnesses, being the stationmaster, the Pullman porter, the stewardess nurse and the rear brakeman, all testified to the effect that Mrs. Risken was off the train and settled in her wheel chair before there was any movement of the train. It also appears in the record that the custom is for the rear end brakeman to signal for movement of the train,

and he testified that he made no such signal and was surprised when the train started to move and that he hurried onto the train and pulled the emergency cord to stop it since he was aware that one employee of the defendant had gone into the depot and had not returned and he could likewise see the stewardess nurse on the platform and knew that she was not on the train.

It is upon this evidence that defendant states that plaintiff was contributorily negligent, and responsible for her own injury.

We consider now if this record shows the plaintiff guilty of contributory negligence as a matter of law. Appellant insists it does because plaintiff of her own volition jumped from the train. As it sets it forth in its brief: ''The plaintiff jumped from the train despite her recent operation. The plaintiff made no attempt to explain why she jumped and abandoned the safety of the vestibule steps for the unknown safety of Mr. Link's arms.''

Just a resume of the situation which confronted plaintiff. It would appear to us that Rose Risken, just out of the hospital after having been there for nearly a month recovering from surgery, unable to walk without assistance in the form of crutches or otherwise, found herself on a sub-zero day standing in the exposed vestibule of defendant's railroad car awaiting the arrival of a wheel chair before alighting. Eventually the wheel chair was brought up and with her left hand holding the railing, her husband behind her and holding her by her right arm, she must have laboriously descended the steps. Before her on the platform is a friend ready to assist her descent. She reached the bottom step and with one foot she reached for the step stool. Now off balance, holding the railing with one arm, the other held behind her by her husband, one foot on the last step of the railroad car, the other reaching for the step stool, she saw the step stool move from beneath her foot, felt the sensation of movement of the train, saw her friend

moving along the platform with the train, in such circumstances she reached out and grabbed the friend, and her husband, seeing she was in the arms of the friend, released his grip on her and she was off the train. We fail to see where it can be said that she jumped from the train. She was "half on and half off' a moving railroad car and a more apt description would be that she fell into the arms of a friend. But in her situation as depicted by the evidence in this case, where is the "safety of the vestibule steps" which defendant states she abandoned? In her physical condition, well known to the employees of the defendant, dangling as she was, "half on and half off" the moving railroad train, what safety did she have on the vestibule steps?

Appellant has cited many cases dealing with persons who jumped from trains or other vehicles. Typical is the case of Chesapeake & O. R. Co. v. Butler, 179 Va. 609, 20 S.E. (2d) 516, 518, wherein the court quoting from Chesapeake & O. R. Co. v. Paris, 111 Va. 41, 68 S.E. 398, 28 A.L.R. N.S., 773, stated:

" 'Where a passenger has been wrongfully carried beyond his station, or has not been given a reasonable time to leave a train, this principle requires him to submit for the time to the situation, secure in his right ultimately to recover for any inconvenience he may suffer, but forbids him to step from a moving train, thereby imperiling his life and limb, and then turn around and engraft the consequences of his own rash act upon the antecedent negligence of the railroad and recover for both.' "

In our opinion, this line of authorities is not applicable here, for the reason that in such cases there definitely existed at the time of the departure from the moving train a choice to either stay on the train or attempt to get off. In the instant case, a far different situation existed, as we have heretofore pointed out. In the opinion in Chesapeake & O. R. Co. v. Butler, supra, that court also stated:

"* * * this court is committed to the doctrine that a passenger on a railroad train (as distinguished from a street car), is guilty of negligence *per se* in voluntarily alighting from a moving train, *except in case where there is a well founded apprehension of peril to life or limb induced by the negligence of the carrier.*" Emphasis supplied.

It appears to us that Rose Risken had a "well founded apprehension of peril to life or limb" by reason of the situation she found herself in.

While a carrier is not an insurer of a passenger's safety, Heck v. N. P. Ry., 59 Mont. 106, 196 Pac. 521, yet its duty toward a passenger is spelled out in section 8-405, R.C.M. 1947, which reads:

"A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill."

It is then well to bear in mind the rule which is well-stated in Emery v. Los Angeles R. Corporation, 61 Cal. App. (2d) 455, 143 Pac. (2d) 112, 116, in the following language that "a person suddenly confronted with an unexpected danger, without any fault on his part, is only required to use such means for avoiding the danger as would be used by a person using ordinary prudence under similar circumstances, and he is not held to that strict accountability which would require that the course chosen be the most judicious one."

Or, as stated in Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 Pac. (2d) 1025, 1031:

"The test as to contributory negligence on the part of the plaintiff in such a case as this, is, Did he, or did he not, in the circumstances, act as would an ordinarily prudent man?"

In our view of the evidence, we fail to find Rose Risken guilty of any negligence because we believe in her situation she acted as any ordinary prudent person would have acted.

The motions for nonsuit and directed verdict were properly denied by the district court.

With reference to the contended erroneous action of the court in permitting Dr. Howard M. Clemmons to answer a hypothetical question propounded by plaintiff's counsel, defendant asserts that the question not only included alleged facts not then in evidence, but included alleged facts never introduced in evidence. When the question was propounded defendant's counsel objected on the ground that no proper foundation had been laid; that the question was complex and unintelligible and assumed facts that had not been shown in the evidence.

The court overruled the objection and permitted the question to be answered upon the assurance by plaintiff's counsel that the matters that had not been proven would be connected up, and if they were not the court would strike the answer. The question was long and involved and concluded with this statement:

"Now assuming these facts to be true, do you have an opinion based upon reasonable certainty and from a medical and surgical point of view as to whether there is or was a causal connection between the twisting and falling described and the condition of ill being found as set forth in the question?"

Following the objection and ruling, the doctor replied that he had an opinion, and he stated it in these words:

"There is a causal connection between the present condition of this plaintiff and the injury as has been previously described."

It must be remembered that Dr. Clemmons is an orthopedic surgeon residing and practicing in Butte, Montana. He first examined the plaintiff in 1956, and he had explained to the jury the type of operation the plaintiff had and estimated the healing time should have been from three to four months, and that a twist of the knee or leg would delay recovery. Plaintiff had discussed with him what occurred at the time of the acci-

dent and as related by him, it did not differ materially from her testimony herein. He further explained that when twisting is experienced, it is possible a dislocation could have occurred, that is, the ball would jump part way out of the socket and slip back in, with the result that some of the tissue and other covering around the joint would experience a stretching and that if the tissue was stretched or torn it could cause swelling and pain, particularly pain on attempted motion. He stated that if there was twisting that it would delay recovery, and in such event it would be possible that there never would be recovery. He examined the plaintiff again in February of 1957, at which time she showed improvement in the range of motion through which the hip joint moved. He examined her again in November of 1957, and at that time on the sides of the artificial device there was a hardening due to irritation by something moving, and the artificial device was a little loose. He stated that a twisting such as the plaintiff advised him of would cause such a looseness. At this last examination sclerosis was present surrounding the device, and he thought the sclerosis was initiated by the twisting, set up by the body to prevent further wabbling and irritation. He also discussed the matter of the pain that plaintiff was experiencing and stated that the pain was caused by the twisting described and discussed by the plaintiff. As to length of the leg there is this testimony:

"Q. There was some shortening of the extremity. State whether or not you feel that is a result of the injury or just is a result of the operation. A. I think possibly this was present prior to the surgery, but I think it bears no relation to recovery, if that were all that was present."

Defendant asserts the question contained two elements which were never proved, the first being that in the question appeared these words: "And subsequent medical examinations by orthopedic specialists and other qualified physicians and surgeons showed that the right leg had shortened by three quarters of an inch, causing her to require a special shoe with a special

sole thereon to compensate for this shortening, and X rays having disclosed that the head of the femur, the metallic ball, had or may have slipped from the socket in which it had been placed during the previously mentioned operation, and sclerosis having developed along the shaft of said artificial prosthesis''.

There appears to be no question but what Mrs. Risken's right leg was three-quarters of an inch shorter than the left and this fact was ascertained by Dr. Klein, the examining surgeon for the defendant, who attributed it to the operation, whereas Dr. Clemmons thought possibly it was present prior to surgery, and he felt it bore no relation to her recovery. It is quite clear in the record that Dr. Clemmons attached no significance whatever to it, and made such statement just prior to the propounding of the hypothetical question.

The statement and the question does not state that the shortening of the leg was caused by the injury though it may possibly leave that inference. As to the metallic ball, the question stated ''had or may have slipped from the socket'', which likewise does not specifically state that it did so slip.

As before stated, the court ordered counsel to connect up the matters which had not yet been proven and later on in the trial during the examination of Mrs. Risken he again called this matter to the attention of plaintiff's counsel, who forthwith questioned Mrs. Risken upon such matters, and in such examination developed that Mrs. Risken was a registered nurse and without objection she testified that she wore a built-up shoe at the present time, about three-quarters of an inch and stated: ''That is because the metal hip joint has been pushed up into the pelvis.'' She further testified without objection:

''Q. Were you advised by Dr. Clemmons or by any other doctor that your condition is permanent? A. He seemed to think it is.

''Q. Dr. Clemmons told you that. A. Yes. He said it looked as though it might be.''

There is nothing further in the record with regard to the hypothetical question; counsel for the defendant made no motion to strike the answer; it was not mentioned in the motion for nonsuit nor in the motion for directed verdict, nor in any proposed instruction of the defendant, though of course a proper instruction was offered by the defendant and given by the court, as to the weight to be given the opinion of an expert witness.

Although the hypothetical question is not a model as to form, in view of the record in this cause we cannot see where it was prejudicial to the defendant.

Turning now to defendant's contention that the court erred in giving Instruction No. 21 over defendant's objection. This instruction reads:

"You are instructed that if you find for the plaintiff, you will award the plaintiff damages in such sum as will fairly compensate her for her injuries, if any, not exceeding $90,-000.000 in all.

"First: For such reasonable sum as will compensate her for the physical pain and suffering that she has suffered, if any, or that it is reasonably likely that she will suffer in the future, if any; for mental pain and suffering that she has suffered, if any, or that it is reasonably likely that she will suffer in the future by reason of said injuries, if any.

"Second: For the reasonable expense, if any, that she has paid or incurred, or that it is reasonably likely that she will be compelled to pay or incur in the future for hospital and medical care and attention in consequence of such injuries."

Defendant complains of this instruction because in its view it allowed the jury to speculate as to the amount of damages to be awarded in the various particulars mentioned in the wording. The entire instruction is couched in the alternative, in other words, the jury would first have to find for the plaintiff, and then the jury were instructed in the alternative as to each element of damage. While defendant urges that there

is no competent evidence as to some of the matters mentioned in the instruction, we believe there was some evidence, slight though it may be, as to the various items complained of by defendant. We find no error in giving this instruction in this cause.

Defendant also urges that the court erred in giving Instruction No. 20, which reads:

"You are instructed that if you find for the plaintiff and you find from a preponderance of the evidence that the capacity of the plaintiff to perform the ordinary duties of a housewife by reason of her injuries has been impaired, then in determining the sum which will compensate her for such loss, if any, her expectancy of life as shown in the evidence from mortality tables is competent evidence to aid you in determining the probable duration of her life. The evidence dealing with mortality tables is not binding upon you, but you may give it such weight as under all the evidence you think should be given to it."

Defendant contends there was no evidence to support future loss of capacity to perform the ordinary duties of a housewife, and further, that the husband has the exclusive right to recover for the wife's loss of capacity to perform such duties.

We think there was sufficient credible evidence to show the incapacity of plaintiff to perform her ordinary duties about the house; that it had existed since the time of the accident, giving due consideration to the medical testimony as to the present condition of the plaintiff. In this connection, even the testimony of Dr. Otto G. Klein, medical witness for the defendant, would give support to the present and future impairment of capacity to perform household duties. He stated: "There is no evidence from this examination that the examinee suffered anything more than a mild aggravation of her preexisting arthritis in her right knee as the result of the alleged accident of November 12, 1955." He further stated that any symptoms as a result of the alleged accident should have long

since subsided and that her condition could be greatly allayed by encouraging greater activity and urging for her to become increasingly active in all respects. Certainly this indicates that at the time of his examination, which was on March 15, 1957, she was not a normal healthy woman capable of doing her housework, and the undisputed evidence of plaintiff's case was to that effect.

As to the husband's exclusive right to recover for the services of the wife, we do not believe that section 36-116, R.C.M. 1947, is applicable to the situation existing here, nor is Gates v. Powell, 77 Mont. 554, 252 Pac. 377, an action in claim and delivery, both cited by defendant.

We are much impressed with the reasoning of the court in Colorado Springs & I. R. Co. v. Nichols, 41 Colo. 272, 92 Pac. 691, 693, 20 L.R.A., N.S., 215, wherein that court said:

"A married woman is entitled to recover damages for the impairment of her ability to labor, independently of the husband's right to recover for the loss of her time. Chief Justice Bleckly, in the case Powell v. Augusta & Summerville R. Co., 77 Ga. 192, 200, 3 S.E. 757, expressly so holds, and states in the course of his opinion: 'It may be thought that the loss of ability to labor is not pain, but this is a mistake. There is no greater blessing of life than the ability to labor, even though the proceeds may belong to another. It is better for happiness, as well as for virtue, to work for nothing than to be idle. A physical injury that destroys the power of a human being to labor is one of the most serious injuries that it is possible to inflict. True, it is not to be measured by pecuniary earnings where the suit is brought by a married woman, for such earnings, as a general rule, belong to the husband, and the right of action for their loss is in him; but the wife herself, has such an interest in her working capacity as that she can recover something for its destruction, and what she is to be allowed ought to be more or less according to the length of time during which her privation is likely to continue. Such privation may well be

classed with pain and suffering, especially where it involves the breaking up of established habits. To man or woman accustomed to work enforced idleness is torture.' ''

The giving of this instruction was not error.

The final contention of the defendant was that the verdict ▮ was so excessive as to appear to have been given under the influence of passion and prejudice and to shock the conscience and understanding of the court. The verdict here was in the sum of $60,000. The life expectancy of the plaintiff was 20.18 years. Over two years after the accident she had not recovered the use of her limb, which the medical witness testified should have occurred under normal circumstances in a few months. Pain and suffering day after day, discomfort every hour, worry, fear and apprehension of what the future holds in store, caused as here by the negligent acts of defendant, are difficult to evaluate in dollars. The jury heard and observed the plaintiff, and all the witnesses in this cause, and they arrived at a figure which in their mind would compensate the plaintiff. We observe no influence of passion or prejudice and the size of the verdict does not shock our conscience in view of the fact situation herein.

The judgment is affirmed.

MR. JUSTICES ADAIR and CASTLES concur. MR. JUSTICE ANGSTMAN being absent took no part in the hearing or determination of this appeal.