THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.* DONALD ALLEN BENTLEY, JR., DEFENDANT AND APPELLANT.

No. 11676.
Submitted June 3, 1970.
Decided July 23, 1970.
472 P.2d 864.

Donald R. Matthews and Anthony F. Keast, Donald R. Matthews argued, Missoula, for defendant and appellant.

Robert L. Woodahl, Atty. Gen., J. C. Weingartner, Asst. Atty. Gen., argued, Helena, Daniel J. Shea argued, Harold J. Pinsoneault, County Atty., appeared, Missoula, for plaintiff and respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from convictions in a multiple count assault case of a first degree count, a second degree count, and a count of carrying a deadly weapon with intent to assault. The appellant, Donald Allen Bentley, Jr., was sentenced to 10 years on the first degree count, 10 years on the second degree count, and 5 years on the carrying a deadly weapon with intent to assault count; the sentences to run consecutively.

According to the police reports the downtown area of Missoula had been quiet the night of May 24, 1968 until the hour of 2:20 a.m., May 25, just after closing time, when the following bizarre occurrences took place. After an evening on the town, the appellant, his wife, and his brother were walking down West Main street when, according to appellant, they were accosted by one Brian Magnuson who allegedly made some remarks to appellant's wife. Appel-

lant, a 33-year-old male, 5' 10" tall, weighing some 160 pounds, took offense and a fight ensued. Magnuson, a 24-year-old ex-fullback for the University, weighing some 220 pounds, whose story differed from that of appellant in that he said appellant made an offensive remark to him, testified that as a result of the remark "* * * we went at each other and I believe started to fight at the time, and I think I hit him first. I am not exactly sure just what happened, but about that time he got up and drew a knife on me."

At the time of the drawing of the knife two University students, David Youngdale and Patrick Melby, came upon the scene. Both saw the appellant with the opened knife in his hand backing Magnuson down the street, witnessed him close the knife and pocket it and begin to scuffle with Magnuson only to be knocked to the ground. Both Melby and Youngdale testified that about that time several men came from across the street either to witness or engage the appellant's brother who was in the vicinity of the first fight and that a second fight broke out between the brother and one of these men. They testified appellant got up from the street, where he had been paralleled by Magnuson, went over to a white Buick, got the keys, opened the trunk and after rustling around in the trunk, came out with a revolver. Youngdale described what happened then: "We then started, Pat and I started yelling at Brian, 'Look out, he's got a gun'. And Brian didn't hear us because he didn't take out right away and we kept yelling at him 'Get out of there, Brian, he has got a gun.' So finally Brian started running down the street and Mr. Bentley raised the gun approximately like this (indicating with arm outstretched) and sighted down right in the general direction of Brian Magnuson and pulled the trigger three times or so. He did not fire. There was not * * *". Both Youngdale and Melby testified they could hear the trigger snap while the gun was pointed at the rapidly departing Magnuson and that appellant then came

over to near where they were standing and pointed the revolver at them and again pulled the trigger two or three times. The following then took place, according to Youngdale's testimony:

"Q. What happened then after he pointed that pistol at you and he snapped the trigger? A. He then walked up to Pat and I and said to us 'Are you part of this punk's crew,' referring to Brian, and I said 'No, I was walking down the street.' And he stood there and we stared at each other for a minute, and then he turned around and walked out into the middle of the street where the fight had been going on and now had stopped, and walked up and without even breaking his stride, he walked up right in front of his brother where a man was standing and with a back hand—he had the gun in his right hand—with a backed hand he hit the larger gentlemen across the cheek and this gentleman, of course, backed up and it was all, the blow was so loud that we could hear it from where we were which was probably 50 feet away.

"Q. You heard the smash of this weapon against his face? A. Yes, we did.

"Q. Now did you notice anything or observe anything about the physical condition of Mr. Gerhardt upon sustaining this blow? A. Well, you could see his face open right away and blood was spurting out.

"Q. And what did you observe after that? A. Then a lady who I presume is Mr. Gerhardt's wife walked up and said 'You can't do that, you son-of-a-bitch.' And Mr. Bentley then came across like this (indicating) and hit her on the— well, it would be on her left cheek.

"Q. And what happened then, Sir? A. She was knocked unconscious at the first blow and fell to the ground.

"Q. At the time, Sir, did you hear the sound of the weapon smash against her face? A. Yes, we did."

The man and woman who were struck by appellant were Mr. and Mrs. William J. Gerhardt. They had arrived at the scene of the night's activity with another couple, Mr. and Mrs. Donald Gilbert, after an evening on the town. The two couples had just left the Turf restaurant when they observed the appellant backing Magnuson down the street with a knife. Gilbert ran across the street to the immediate scene of the fight and became engaged in a fight with appellant's brother Shannon, who up to that time had been immediately available to his brother, in case of need. Shannon Bentley appeared to be better at fisticuffs than appellant for he decked Mr. Gilbert and was putting the boots to him when Mr. Gerhardt intervened in defense of his friend. For being the good samaritan Gerhardt got punched in the mouth by Shannon and had to fight Shannon. This fight ended with a handshake between the two men and it was while he was shaking hands with Shannon Bentley that appellant struck Gerhardt. The blow was on the right side of the face.

Dr. Callahan, the attending oral surgeon, comparing Mr. Gerhardt's injuries to those suffered by his wife, testified the injuries were "* * * confined to the right side of the face in the same areas, the comminution or the breaking into small pieces was not as extensive, but the same bones were involved with nearly the same type of depression and fracture of the lateral wall of the upper jaw.

"The zygomatic arch again and the body of the zygoma. Also, the lateral rim of the orbit and the inferior rim of the orbit." As can be seen from Dr. Callahan's testimony Mr. Gerhardt suffered grievous injuries requiring both hospitalization and surgery.

Mrs. Gerhardt, coming out of the Turf with her husband and the Gilberts, observed the melee in the street but did not venture into the fracas until her husband became involved with Shannon Bentley. She then attempted to get her hus-

band out of the fray only to be struck down by appellant as she reached her husband's side. She witnessed appellant striking her husband with the pistol; her next recollection was coming to, lying in the street. Appellant hit her with the pistol immediately after striking Mr. Gerhardt. Dr. Callahan described her injuries as follows:

"A. At the time of my examination, Mrs. Gerhardt over the left side of her face was badly swollen. There was ecchymosis, black-and-blue areas over this entire area. She had difficulty opening her mouth. There was considerable swelling inside the mouth and this is all confined to the area of the, around the eye and over (indicating), what would be known as the cheek bone.

"X-ray interpretation was done and this was found that she had received, she had fractures over this entire area (indicating), what we call the cheek bone or the zygoma. The rim of the orbit around the eye was badly comminuted or in many pieces. This is the zygomatic arch. This zygomatic arch was also fractured in many pieces. The lateral wall of her maxilla or under jaw inside was also in pieces, with portions of the cheek bone or the body of the zygoma being driven into her maxillary sinus." From these injuries Mrs. Gerhardt suffered grievous pain, was hospitalized and underwent surgery.

In order not to be repetitious we will summarize by stating that the record discloses numerous witnesses who testified concerning appellant's conduct, his use of the knife, his pointing the gun and pulling the trigger at Magnuson, Melby and Youngdale, and confirming the assaults on Mr. and Mrs. Gerhardt. Their testimony is voluminous and uncontradicted.

Immediately after the assaults on the Gerhardts, appellant ran to the white Buick, from which he had obtained the pistol, and was driven off at a high rate of speed by his wife who had been in the car during the fight. Just as the appellant's car left the scene, a police car arrived. Upon hearing

from the witnesses that a man with a gun was in the departing Buick, the police car, carrying two officers, pursued the car and stopped it within a few blocks. During the pursuit officers Doty and Pfau observed appellant trying to put something under the seat. Upon stopping the Buick, the officers ordered the occupants out of the car, searched them and the car. They found the pistol under the front seat of the Buick and placed appellant under arrest. Later, at the police station, Mrs. Bentley was arrested for a traffic violation. Within a short time appellant was taken before a police judge where he was informed of his rights and the charges and where, due to his obstreperous conduct, he was found in contempt on four separate occasions. Thus ended the Bentleys' night on the town.

These events of the early morning of May 25, bizarre and confusing as they may be, are lighthouses when compared with the pretrial and trial tactics of appellant.

For the sake of brevity we list the events that occurred between May 25, 1968 and January 22, 1969 when appellant went to trial on thirteen separate assault counts; on motion of appellant certain of these were dismissed during trial.

1. *May 25, 1968* Defendant arrested by Missoula city police. Appeared in police court before Judge Clarke and found in contempt of court for conduct. $2,000 bond set and posted.

2. *June 3, 1968* First degree assault complaint filed in justice court. Bond set at $8,000. Posted and defendant released.

3. *June 17, 1968* Information of 11 counts filed directly in district court. $25,000 bond set.

4. *June 28, 1968* County attorney files an amended information.

5. *July 2, 1968* Defendant arrested.

6. *July 8, 1968* Defendant appeared before district court with his hired counsel Anthony Keast and with the public

defender, Donald R. Matthews. On their motion bond was reduced from $25,000 to $15,000. Arraignment set for July 10, 1968.

7. *July 11, 1968* Defendant with counsel Keast and Matthews appeared for arraignment. Defendant was duly arraigned upon the amended information; acknowledged receipt of a true copy; waived the reading of the same; and answered that his true name appeared on the amended information. Defendant asked for further time to enter a plea. July 18, 1968 set for further arraignment.

8. *July 18, 1968* Counsel Keast appeared and asked for further time. Defendant having earlier been granted permission to leave the state had not returned. Arraignment set for July 25, 1968, and Mr. Keast was directed to have all motions for the defense before the court on that date.

9. *July 25, 1968* At 9:30 a.m. counsel Donald R. Matthews appeared for arraignment but defendant was not present. Continued to 10:00 a.m. Defendant appeared at 10:00 a.m. with counsel Matthews, but refused to enter a plea demanding that attorney Keast should be present. Court entered plea of "not guilty", and set the trial for October 14, 1968.

10. *October 23, 1968* Counsel Matthews appeared before court with a letter from Dr. FitzGerald of Wallace, Idaho, advising court of defendant's physical condition and inability to stand trial. Defendant's motion to vacate trial setting granted and case continued over term.

11. *December 12, 1968* Trial Judge Green revokes defendant's permission to leave the state and orders his appearance within 15 days. Trial date set for January 20, 1969.

12. *December 30, 1968* Defendant, accompanied by public defender Matthews, appears and requests permission to leave the state until trial date of January 20, 1969. Denied. On the same date the bonding company revoked defendant's bond.

13. *January 2, 1969* Defendant, with counsel Keast and Matthews, appears and waives speedy trial and consents to trial as previously set on January 20, 1969. Numerous motions denied.

14. *January 7, 1969* Defendant appeared with counsel Keast and Matthews for the purpose of submitting motions, including motion to rely on mental disease or defect. Denied. Bail posted and defendant released.

15. *January 9, 1969* Defendant consults with Dr. Hogan, a Missoula psychiatrist. On same date at the request of defendant and public defender Matthews, defendant is sent to the state hospital for examination.

16. *January 15, 1969* Trial Judge Green receives the following telegram from the state hospital: "Please inform relatives Donald Bentley is ill. Diagnostic impression is coma. Condition critical."

17. *January 17, 1969* Judge Green revokes bail having received a report from the state hospital that defendant had overdosed himself with narcotics while in hospital.

18. *January 22, 1969* Trial started.

The issues raised on this appeal are as follows:

1. Whether the trial court properly denied appellant's motion of January 6, 1969 to rely on the defense of mental disease or defect.

2. Whether the trial court erred in refusing to let Dr. Hogan testify in appellant's behalf.

3. Whether the trial court erred in denying appellant's motion for a mistrial.

4. Whether the appellant was prejudiced by wearing jail clothing during the trial.

5. Whether the court erred in refusing to dismiss the charge of carrying a deadly weapon with intent to assault Brian Magnuson.

6. Whether the trial court lacked jurisdiction to hear appellant's case.

7. Whether the trial court erred in using the increased punishment statutes.

8. Whether the trial court erred in refusing to dismiss the first degree assault charge involving Mr. Gerhardt.

Issues No. 1 and 2 raised by appellant concern the court's alleged abuse of discretion by refusing the appellant's motion to rely on mental disease or defect.

A criminal trial is a search for truth consistent with proper attention to the rights of the individual. In order to protect the rights of the individual and to provide for the orderly presentation of a criminal case, certain procedural rules have been adopted both for pretrial and trial. It is of the utmost import that the defense as well as the state follow these rules in order to establish a climate wherein justice can prevail. Montana in an effort to update and modernize its criminal procedure act enacted a revised code in 1967. Chapter 17 of this code, sections 95-1701 through 95-1710, R.C.M. 1947, concerns pretrial motions. A careful review of the transcript in this case reveals a studied effort on the part of appellant to delay and confuse the orderly and speedy presentation of his case. Approximately one-fifth of the transcript is devoted to motions made out of order. Section 95-1704, R.C.M.1947, is directed to the time for making a motion. It directs that a motion shall be made before the plea is entered! Here a plea was entered on July 25, 1968 with appellant and one of his counsel present. Appellant refused to enter a plea stating he had a right to have both counsel present so the trial judge entered a plea of not guilty for him. It should be noted that at the time of entering this plea there had already been three delays in hearing the arraignment—all caused by the appellant. It should be further noted that on July 18, 1968 the trial court ordered Mr. Keast, one of the counsel for appellant, to have all defense material before the court before July 26, so that

it could be disposed of at that time. This order was not complied with nor did Mr. Keast appear on July 26.

Trial was set for October 14, 1968, but was rescheduled for the next calendar due to the appellant's alleged physical condition. The record shows that on October 23, 1968, a letter was received from a Dr. E. J. FitzGerald of Wallace, Idaho, notifying appellant's counsel that appellant was in the hospital suffering from chest pains and that he, Dr. Fitz-Gerald, had appellant under intense care and rest and would keep him there for from two to four weeks. The doctor further wrote: "* * * it is my feeling that he should not be subjected to any mental, psychological or emotional stress or strain for a period of at least four to five months." The record shows, and Judge Green was aware of this when he ordered appellant to trial in January 1969, that instead of staying in the hospital from two to four weeks appellant within a week of the date of the letter went to Seattle, Washington. It was upon notification of this fact that appellant was ordered to return to Montana and stand trial.

On January 2, 1969 appellant appeared before Judge Green who notified him trial would be set for January 6 unless he asked for a postponement and that January 20 would be the trial date if he waived speedy trial and requested the postponement. He waived speedy trial and January 20, 1969 was set for the trial. Mr. Keast again presented the court with numerous motions, including his intention to rely on mental disease or defect—section 95-503, R.C.M.1947. These motions were considered by the trial court and denied. The same motions were again presented to the court on January 7 and January 20, before appellant went to trial. In all, from June 1968 to January 20, 1969, some 25 motions were filed and ruled on by the trial court.

Prior to trial and while appellant was held in the county jail, the trial court on appellant's motion, ordered appellant to the Montana State Hospital. The order directed the au-

thorities at the hospital to determine whether appellant was suffering from a mental disease or defect and whether he would be able to understand the proceedings against him and assist counsel on his own behalf. He arrived at the hospital on January 10, 1969 and within 5 days he injected some narcotic into his veins which caused cyanosis, respiratory arrest, cardiac arrest and a deep coma. Fortunately for appellant he received proper medical care which saved his life. The report of the state hospital psychiatric evaluation board to Judge Green, dated January 20, 1969, said in part:

"* * * at the time, he was quiet and coherent, well oriented, in good contact with the environment, in a serious mood, and neither psychotic nor depressed. In the clinic, he was given the following diagnoses: 1) Antisocial Personality. 2) Passive-aggressive Personality. 3) Drug Dependency, opium, opium alkaloids and their derivatives. * * .*

"We found that Mr. Bentley is not suffering with any mental disease or defect and, in our capacity, he can understand the proceedings against him and he is able to participate and assist in his own defense."

With this hospital report on hand, appellant on the day of trial again moved the court to grant his motion to rely on mental disease or defect, section 95-1803(d), R.C.M.1947, even though it had not been filed within the statutory time. His motion was denied. Then, during the case for the defense, it was brought to the court's attention by the prosecutor that he had learned the night before that a certain witness, one Dr. Hogan, a psychiatrist practicing in Missoula, was being subpoenaed to appear and he asked that the court be informed why, in view of the court's rulings. Defense counsel stated to the court that Dr. Hogan had examined appellant and he would testify as to his competency at the time of the assaults. At this time the trial judge recessed the trial and took under advisement a request of the state for a continuance until such time as the state could obtain evidence to rebut

the proposed testimony. After further discussion and consideration, the trial judge ruled—denying defense the use of Dr. Hogan as a defense witness. The ruling of the court was:

"Further, a review of the file indicates that on January 6th, 1969, the Defendant filed a notice of intention to rely on disease or mental disease or defect; that this motion was denied by the Court on January 7th due to the fact that it was not submitted within the time provided by the statutes, actually having been submitted subsequent to the first trial setting of this cause. Thereafter on January 9 of 1969, counsel for the Defendant renewed the motion, was taken under advisement by the Court and subsequently was granted subject to certain conditions as set forth in the order signed by the Court. The order was to the effect that he be committed or present himself to the State Hospital at no later than 10:30 a.m. *January 10, 1969,* for an examination for a period of not exceeding seven days. The purpose of the examination was to determine the mental condition of the Defendant and if the Defendant suffered from a mental disease or defect, and an opinion as to his ability or capacity to understand the proceedings to assist in his own defense.

"A report to this effect has been received from the State Hospital, copy has been given to counsel for The State of Montana and counsel for the Defendant.

"Therefore, due to the fact that the notice was not filed within the time provided by the statute, further no notice was given to the State pursuant to Section 95-1803, sub-paragraph (d), it is the ruling of the Court that the Defendant may not rely on the defense of disease or mental defect excluding responsibility as provided in Section 95-501, Revised Codes of Montana, and following. And no witnesses will be permitted to testify as to this particular point other

than as to the Defendant's capacity to understand the proceedings against him and to assist in his own defense as provided by 95-504."

Counsel for appellant then made the following offer of proof in the form of a hypothetical question to Dr. Hogan:

"Doctor, please assume that the subject of this hypothetical question is a man of the age of 33, 5' 10", 165 pounds, at the time of the events set forth.

"He was the second child in a family of four, his father never lived with the family and did not support them in any way. The family was extremely poor and lived on welfare most of the time. He had an unhappy childhood, and his mother was very religious. He finished the Seventh Grade while home and the Eighth Grade while in Alaska. He left home permanently when he was 13 years old.

"Assume further that this man has been married three times; two children by his first wife, and a boy who died after birth to his third wife, a step-son lives with him and his third wife.

"Assume further, doctor, that Subject has been in several automobile accidents, injuring his left leg, left shoulder and arm seriously. He cannot lift his left arm much higher than his head. Also, Subject was a bronc rider fisherman in the Rodeos and while pursuing this activity, he has had ribs broken, legs and arms broken and mild concussions.

"Assume further, doctor, that one year ago, Subject and his wife were beaten by eight men in Orofino, Idaho, and said men opened their car doors and drug them out. Several policemen interfered or the beating would have been more serious. One of the eight men had wanted to dance with the wife of Subject and that is the reason for the fight.

"Now, doctor, assume that Subject had been up for 2½ days on Benzedrine and some drinking and booze. On the evening of May 24th, he was at his home, with his wife, step-

child, mother-in-law and aunt. From 7:00 until 9:00 P.M., they were at Sentinel High School watching their daughter Lisa dance in a recital.

"From 5:00 P.M., until 12:00 he had taken approximately 7 Benzedrine tablets and numerous drinks; he was drunk by 11:00 P.M. He had become irritated by his mother-in-law's constant conversation. At 12:00, he could stand it no longer so he, his wife and younger brother got in the car and the wife drove to the Park hotel and drank and then to Cabin Bar, where he drank. From there, they went to Jerrys' Lounge and drank until 1:45 A.M., when they went to the Gay Nineties. They had one drink there and left because it was 2:00 A.M. They walked down the alley to Higgins and North to Main and went on Main.

"One week prior to this time, the wife and younger brother had been in Jerry's Lounge and the wife sat at the bar waiting for the younger brother to finish a conversation with a third party. Mel Magnuson, who was tending bar asked the wife what she wanted and she said nothing. He said, come on, you will have one and she declined. He then asked her what she usually drinks and she said Vodka Squirt. He fixed her a drink, which was not paid for, and as she sipped her drink, he asked her what her name was, where she was from and what she was doing. In other words, he engaged her in general conversation. She asked him if he was a football player and he said yes explained who he played for, etc.

"After she and the younger brother had been there for approximately ten minutes, she got up to leave with the brother and Magnuson said, what's your hurry, why don't you stick around; she left without saying anything.

"As the three parties were walking down the sidewalk in front of Jerry's Lounge, Mel Magnuson was walking behind them caught up with them and then started to pass them. At this time, Mel Magnuson said to the wife 'you are in

pretty bad company, why don't you come along with me and I will show you a better time' and he told Subject that he should sober up. Subject said, you should talk. Mel Magnuson said something about Subject being a cock-sucker Subject retaliated with a similar profanity. Mel Magnuson then told Subject he would like to see how tough he is.

"Magnuson and Subject then engaged in a flurry of swings and Subject went down. At this time, Subject got up, took a pocket knife out, and held it in front of himself with the blade open. Magnuson said, I told you, you were nothing without a knife, and you put the knife away and we will go to it. Subject no sooner had put the knife back in his pocket than Magnuson hit him with a flying tackle in the stomach so hard that they both left the ground and when they fell in the gutter Magnuson was on top still hitting Subject with his fists.

"There were very few people on the street or sidewalk when the fight started, but after this first flurry, about 8 people came out of Jerry's and more came out of the Turf across the street. There were now about 25 people milling around in the general area.

"Subject's wife got in the car and locked the doors until her husband got in later.

"While this was going on, Gilbert ran from across the street and jumped on Subject's younger brother, who is 5'8" tall and weights about 155 pounds. The younger brother was getting the best of Gilbert when Gerhardt came from across the street and broke up this fight and started fighting with Subject's younger brother. Gerhardt is 6'1" and weights 200 pounds and is very muscular. Gerhardt was beating Subject's younger brother badly as he was punching him down the middle of the street in a westerly direction.

"About this time Subject went to his car and got a .38 Revolver. He pointed it in the direction of Magnuson and pulled the trigger three times. Subject then pointed the

pistol at the people in front of Jerry's Lounge and pulled the trigger numerous times. He then walked over to two innocent bystanders who were standing on the sidewalk in front of the Jewelry Store and pulled the trigger several times while asking them if they were part of the gang. They said, no, no, we have nothing to do with it. It was this group, Pat Melby, who had yelled to Magnuson several times saying, 'watch out Mel, he has a knife', and later 'watch out Mel, he has a gun'. Subject's wife also yelled at Mel saying run, he has a gun.

"Subject then walked over to where his younger brother was getting beat up and hit Gerhardt in the face with the gun. He then pulled the trigger several times while aiming at Gerhardt's stomach.

"About this time Mary Gerhardt ran up to Subject and called him a son-of-a-bitch and hit him on the head with her purse. Subject then swung around and hit her in the face with the gun.

"During all of this time, which took about five minutes, there were 20 to 25 people in the general area; none of whom Subject knew with the exception of his wife and younger brother.

"Assume further, doctor, that Subject believed his wife and younger brother to be in serious danger of being beaten by Magnuson and his gang.

"Assume further, doctor, that the Subject was arrested immediately and taken to the Police Station. While there, he would not let them take his picture or fingerprints. He was handcuffed but he struggled, shouted and cursed and he would not let Judge Clark arraign him. Three policemen then restrained and gagged Subject so Judge Clark could finish the arraignment in open Court.

"Now then, doctor, assuming these facts to be true, do you have an opinion as to whether the husband, Subject of this hypothetical question, at the time of the assaults, was suffer-

ing from a mental disease or defect as a result of which he was unable either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

"What is that opinion?

"It is my opinion that Subject was sufficiently under the influence of the drug Benzedrine and alcohol that his judgment was so impaired as to produce an abnormally violent protective reaction when attacked. His condition would be classified as Acute Brain Syndrome secondary to drug intoxication. I believe there is about an 80% probability that this man was unable to appreciate the criminality of his conduct or conform to the laws requirements.

"Henry W. Hogan"

We have laboriously quoted the foregoing dissertation of defense counsel which he labeled a "hypothetical question" or an "offer of proof". We find it difficult to label it as anything. However, conceding that it did require a ruling by the trial court, at most it suggests "voluntary intoxication" rather than a plea of mental disease or defect as contemplated by section 95-504, R.C.M.1947.

We find that the trial court properly refused the offer of proof. Many of the so-called facts set forth in the hypothetical question had not been previously testified to directly, or through medical records, such as: the facets of his multiple marriages; his unhappy childhood, various automobile accidents; the alleged beatings at Orofino, Idaho; the fact that he had been without sleep for 2½ days, etc. The fairness of a hypothetical question is largely a matter resting in the discretion of the trial court whose rulings thereon will not be a ground for reversal in the absence of a showing of an abuse of discretion. To say the least, the question is not a model for future law students. The court did not abuse its discretion in not permitting the question. State v. Noble, 142 Mont. 284, 384 P.2d 504; Jangula v. United States Rubber,

147 Mont. 98; 410 P.2d 462; State v. Crowe, 39 Mont. 174, 102 P. 579; State v. Peel, 23 Mont. 358, 59 P. 169; Underhill's Criminal Evidence 5th Ed., §§ 460, 461.

We have said heretofore our description of the bizarre and confusing events of May 25 were "lighthouses when compared with the pretrial and trial tactics of appellant." He had refused to plead to the information; one of his counsel had not complied with the court's order to get all motions in before the time for plea; he left the jurisdiction and later had a doctor send a letter to the court reporting him to be in intensive care and not available for trial for several months only to leave that doctor's care within a week. Then, when finally back in the court's jurisdiction and confronted with a trial date, he requested a mental examination at the state hospital where he "voluntarily" took an overdose of drugs in an apparent effort to confuse the examining physicians and psychiatrists.

In a proper case, and under different circumstances than shown here, a trial judge might allow psychiatric proof and it would not be error to do so even though the motion was untimely. As we said in State ex rel. Sikora v. Dist. Ct., 154 Mont. 241, 462 P.2d 897:

"We cannot in this proceeding anticipate the various problems that may arise during trial, but we note that the trial court has been given permissiveness in the application of the rule and we are certain that the trial judges of this state will apply sound discretion whenever and wherever basic questions concerning constitutional questions arise."

But here in the course of the trial and the pretrial maneuverings, much of it "sham", we find the trial court exercised its discretion and we find no abuse of it.

Parenthetically here we note that appellant and not his counsel, contributed to the subterfuge practiced on the court.

This Court in *Sikora* gave full consideration to a constitutional challenge to section 95-1803(d), R.C.M.1947, and

we upheld the legality of the pretrial disclosure of defenses as set forth by that statute. We further noted and listed some six states having similar provisions of notice if insanity is to be pled, and some 8 states that expressly require notice if the defense of irresponsibility is to be specially pled.

Last but not least, the United States Supreme Court in a very recent case, June 22, 1970 Williams v. State of Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446, upheld the constitutionality of a pretrial disclosure statute concerning the defense of alibi. The court held concerning the "due process" arguments as follows:

"We need not linger over the suggestion that the discovery permitted the State against the petitioner in this case deprived him of 'due process' or a 'fair trial.' Florida law provides for liberal discovery by the defendant against the State, and the notice-of-alibi rule is itself carefully hedged with reciprocal duties requiring state disclosure to the defendant."

The same reciprocity is found in section 95-1803(d), R.C.M. 1947. The court additionally commented on the "due process" argument:

"The adversary system of trial is hardly an end to itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as 'due process' is concerned, for the instant Florida rule, which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence."

The court noted, in replying to the defendant's argument that the state of Florida had violated his rights under the Fifth and Fourteenth Amendments, as follows:

"At most, the rule only compelled petitioner to accelerate the timing of his disclosure, forcing him to divulge at an

earlier date information which the petitioner from the beginning planned to divulge at trial. Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense, any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself.

"Petitioner concedes that absent the notice-of-alibi rule the Constitution would raise no bar to the court's granting the State a continuance at trial on the grounds of surprise as soon as the alibi witness is called. Nor would there be self-incrimination problems if, during the continuance, the State was permitted to do precisely what it did here prior to trial: To depose the witness and find rebuttal evidence. But if so utilizing a continuance is permissible under the Fifth and Fourteenth Amendments, then surely the same result may be accomplished through pretrial discoverey, as it was here, avoiding the necessity of a disrupted trial."

Considered in the revealing light of the above quoted case, appellant's failure to comply with the trial court's order to have all motions of defense submitted before the arraignment on July 22, 1968; the six month delay in going to trial during which the defense made no effort to prepare and submit any motions; the fact that on appellant's application he was sent to the state hospital for a psychiatric examination and that the report was made available by the court to all parties in the trial, we decline to hold that the trial court erred in denying appellant's late motion to rely on the mental disease statute as a defense.

Issue No. 3 is directed to the trial court's failure to grant a mistrial after one of the witnesses mentioned during direct examination that the assaulted woman, Mrs. Gerhardt, was pregnant at the time she was assaulted.

In a pretrial motion the appellant requested that state witnesses be directed by the court not to mention that Mrs. Gerhardt was pregnant at the time of the assault. The court granted this motion and cautioned all parties not to mention this fact. Why, in view of the facts set forth here, the trial court granted this motion we do not know, but it was granted. However, during direct examination of Mrs. Gilbert, she testified:

"A. Yes Sir. Mr. Bentley then came to Mrs. Gerhardt and struck her in the face with the pistol.

"Q. (By Mr. Shea) Do you recall where he struck her? A. Yes, on the left side on the cheek.

"Q. Did you hear the sound of the pistol striking against her face? A. Yes, I did.

"Q. Would describe as best you can the sound of that pistol hitting her face? A. Just a sharp crack.

"Q. What happened to Mrs. Gerhardt after Mr. Bentley hit her with the pistol? A. She fell to the ground.

\*    \*    \*    \*    \*    \*    \*    \*

"Q. And what did you do after that time? A. I yelled at Mr. Bentley to leave her alone, that she was pregnant."

With the cat out of the bag appellant's counsel immediately asked to argue outside the presence of the jury and requested a mistrial.

Judge Green refused to grant a mistrial noting that in his opinion the answer was not sufficiently prejudicial to justify a mistrial. In a rather quixotic statement, Judge Green noted:

"\*    \*    \* I mean, if a man strikes a woman with a pistol in his hand, is the fact that she is pregnant, does that make the crime sufficiently more heinous to justify a mistrial at this state? I don't know, but I think probably not. Therefore, the motion is denied."

This Court will not reverse a decision of the trial court unless prejudice is shown, and such prejudice will not be

presumed but must be affirmatively shown. State v. Love, 151 Mont. 190, 440 P.2d 275; State v. Walker, 148 Mont. 216, 419 P.2d 300; State v. Heiser, 146 Mont. 413, 407 P.2d 370.

In a recent case, State v. Gallagher, 151 Mont. 501, 506, 445 P.2d 45, 47, this Court in speaking of technical errors, which this is if it be error, said:

"If there was any error at all it was merely technical, and there is a long standing rule in this jurisdiction—based at the time of the instant trial, on section 94-8207, R.C.M.1947, which has since been replaced by section 95-2425—that technical errors or defects will not provide a basis for a reversal in a criminal prosecution."

We find no reversible error in the trial court's refusal to grant a mistrial.

■ Issue No. 4 relates to whether appellant was prejudiced by having to wear jail clothing during the trial. We find no merit to this contention nor did appellant's brief favor us with any citations supporting this position. If this were a bona fide point of issue, counsel for appellant could have avoided it by requesting appellant's wife to furnish clothing from their home in Missoula. Further, appellant had $300 in funds available at the time of trial if he wanted other clothing.

■■ Issue No. 5 relates to the court's refusal to dismiss the charge of carrying a concealed weapon with intent to assault Brian Magnuson.

Section 94-909, R.C.M.1947, provides:

"Every person having upon him a deadly weapon with intent to assault another is guilty of a felony, and, upon conviction thereof, shall be punished by imprisonment in the state prision for a term of not less than one year nor more than five years."

Appellant's contention here is that there was no evidence that Magnuson knew of the pistol being pointed at him and no felony was committed. We find no merit in this conten-

tion even though Magnuson testified that he did not know appellant was armed with anything but a knife and he was at no time in fear of his life. The facts are that after shouts by several witnesses "he has a gun," Magnuson took off on the run, performing some of the finest evasive open field running of his career, and disappeared around a protective corner. The jury heard this testimony from other witnesses and chose to believe it. Appellant relies on State v. Quinlan, 126 Mont. 52, 244 P.2d 1058, contending that the trial court erred in giving Instruction No. 14, which reads:

"The laws of Montana provide that every person having upon him a deadly weapon with intent to assault another is guilty of a felony. In order for the defendant to be found guilty of this charge the State must prove beyond a reasonable doubt that the defendant armed himself for the specific purpose of committing the assault. You may not infer such intent from the bare fact that he bore a weapon at the time of the assault."

This instruction taken from State v. Hodge, 84 Mont. 24, 273 P. 1049, was a proper instruction in this case.

The issue here is whether the appellant at the time in question armed himself with the specific intent of assaulting Magnuson; was his purpose, his intent in having the gun, to assault Magnuson. To prove the offense charged there must be something more than that the appellant committed an assault. There must be proof that he bore a deadly weapon for the purpose of committing the assault. He must have armed himself with the intent to commit it. Under the facts shown here, it is abundantly clear that appellant is guilty of the charge.

Issue No. 6 relates to whether the court lacked jurisdiction due to alleged procedural errors by the prosecution.

As previously noted the state filed its information, after leave to file had been granted, on June 17, 1968. On June 28, 1968, an addendum to the original information was

filed, such addendum being labeled an "Amended Information." From the length of the exchange in the record, it was clearly understood by appellant's counsel to be just an addendum. Counsel acknowledged in his court appearance on January 20, 1969 "We are not claiming surprise * * *". Taken together, the original information and the addendum as they were filed and served upon appellant at the time for entering plea, were sufficient in that a person of common understanding would know what was intended to be charged. State v. Dunn, 155 Mont. 319, 472 P.2d 288; State v. Bogue, 142 Mont. 459, 384 P.2d 749; State v. Board, 135 Mont. 139, 337 P.2d 924; State v. Davis, 141 Mont. 197, 376 P.2d 727. We find no prejudicial error.

Issue No. 7 contends the trial court erred in utilizing the increased punishment statute, section 95-1506, R.C.M.1947.

Appellant alleges two cases were filed against him, in Alaska in October 1961 and that both had been vacated and remanded by the United States Supreme Court to the Alaska Supreme Court for reconsideration, thus leaving the impression that he suffered no prior conviction. (Bentley v. Alaska, 374 U.S. 106, 83 S.Ct. 1689, 10 L.Ed.2d 1027; Bentley v. Alaska, 374 U.S. 107, 83 S.Ct. 1689, 10 L.Ed.2d 1028). However, upon remand the Alaska Supreme Court on June 17, 1964 (Bentley v. Alaska, Alaska 1964, 393 P.2d 225) affirmed its former decision finding appellant guilty of an assault with a deadly weapon. We find no merit in this contention.

Appellant's issue No. 8 turns to the court's refusal to dismiss the first degree assault charge involving Mr. Gerhardt.

Section 94-601, R.C.M.1947, provides in part:

"Every person who, with intent to kill a human being, or to commit a felony upon the person or property of the one assaulted or of another:

"1. Assaults another with a loaded firearm, or any other deadly weapon, or by any other means or force likely to produce death; * * * is guilty of assault in the first degree * * *."

The necessary elements of the offense are: 1) Intent 2) to commit a felony 3) upon the person of another, and 4) assaults with a deadly weapon.

Judge Green, the trial judge, carefully and properly instructed the jury as to a first degree assault in Court's Instructions No. 13 and 14 as follows:

"Instruction No. 13 First degree assault is defined as follows: Every person who, with intent to commit a felony on any other person or property of the one assaulted or of another, assaults another with a deadly weapon or by any other means or force likely to produce death is guilty of assault in the first degree. An essential element of the crime of first degree assault is that the weapon used must have been a deadly one. A deadly weapon is any object or weapon which is used in such a manner as to be capable of producing death. In this case as to the alleged assault on Mr. and Mrs. Gerhardt, the State has charged that the deadly weapon was a pistol used as a bludgeon or club. As to the remainder of the alleged assaults, the State has charged that the deadly weapon was a pistol. Another essential element of the crime of assault in the first degree is the intent to commit a felony upon the person assaulted. Criminal intent is an essential element of assault. There must exist a joint operation of act or conduct and a specific intent. There must exist in the mind of the perpetrator the specific intent to commit a felony and unless such intent so exists that crime is not committed. The specific intent required here is that the defendant must have intended to wrongfully wound or inflict grievous bodily harm. If you find the defendant did not have the specific intent to wound or inflict grievous bodily harm at the time of the act in question or

if you find that he was not armed with a deadly weapon at the time of the act in question, then this essential element of the assault in the first degree has not been fulfilled. To constitute an assault with a deadly weapon with intent to commit a felony actual injury need not be caused. The necessary elements are the unlawful attempt with the intent to wilfully or wrongfully inflict grievous bodily harm, the use of a deadly weapon in that attempt and the present apparent ability to accomplish the injury. The defendant need not have the actual ability to commit the assault, but it is sufficient if he has the present apparent ability. It is sufficient if the alleged assault victim has in his mind a reasonable apprehension of immediate physical injury. If an injury is inflicted, that fact may be considered by the jury in connection with all the evidence in determining the means used, the manner in which the injury was inflicted and the type of offense committed * * *''

"Instruction No. 14. The laws of Montana provide that every person having upon him a deadly weapon with intent to assault another is guilty of a felony. In order for the defendant to be found guilty on this charge the State must prove beyond a reasonable doubt that the defendant armed himself for the specific purpose of committing the assault.''

Here the information charged appellant as follows:

"That on or about May 25, 1968, at Missoula, Montana, Donald Allen Bentley, Jr., then and there being, then and there did wilfully, wrongfully, and unlawfully, inflict grievous bodily harm upon William J. Gerhardt, a human being, by the use of a weapon, namely, a pistol, all of which is in violation of Montana law.''

Section 94-602, R.C.M.1947, provides in part:

"*Assault in second degree.* Every person who, under circumstances not amounting to the offense specified in the last section: * * *

"(3) Willfully or wrongfully wounds or inflicts grievous bodily harm upon another, either with or without a weapon; * * * is guilty of an assault in the second degree [a felony] * * *." State v. Farnham, 35 Mont. 375, 89 P. 728.

The distinguishing factor between assault in the first degree and second degree is the intent. State v. Lukus, 149 Mont. 45, 423 P.2d 49; State v. Madden, 128 Mont. 408, 276 P.2d 974. Here the jury found such intent and we find no error.

The judgment and sentence of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES and DALY concur.

HASWELL, Justice.

I concur in the result reached in the foregoing opinion, but not in all that is said therein.