No. 12468

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

ROBEY HATFIELD,

Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Sandall, Moses and Cavan, Billings, Montana
K. D. Tolliver argued, Billings, Montana

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
J. C. Weingartner, Assistant Attorney General, argued,
Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana
Diane G. Barz argued, Deputy County Attorney, Billings,
Montana

---

Submitted: October 2, 1973
Decided: DEC - 7 1973

Filed: DEC - 7 1973

Thomas J. Kearney

Clerk

Hon. Edward T. Dussault, District Judge, sitting for Mr. Justice John Conway Harrison, delivered the Opinion of the Court.

Defendant Robey N. Hatfield was convicted of murder in the first degree by a jury in the district court of the thirteenth judicial district, county of Yellowstone. He was sentenced to life imprisonment. From this conviction, he appeals.

Hatfield, a 68 year old college graduate, in the last few years had assisted his 53 year old wife, Eva, in the operation of a cafe in Billings.

In the late afternoon of April 8, 1972, an acquaintance, Stanley McMillian, age 45, came to the cafe for a cup of coffee, as he had done many times previously. At about 5:30 p.m. the cafe was closed and Hatfield, Eva, a male cook, and McMillian had coffee together after Eva had returned from a short shopping trip.

Hatfield announced he was going home to check on their son, Robey Hatfield, Jr., with whom the parents had had some trouble in the last year. Mrs. Hatfield said she was going with McMillian and assist him in finding his girl friend, Caroline, and that she would be home early.

Hatfield did go to their home but found the son absent. He stayed at home, did some reading, watched TV, then fell asleep. At about 10:00 p.m. he was awakened by a telephone call from one of their waitresses, inquiring whether she should come to work the next day. Hatfield then dozed off again and later was awakened by a telephone call, but by the time he answered it the calling party had hung up. He again awakened around 11:00 p.m. and finding his wife was not home, he dressed, put on his overcoat and hat and put a .22 caliber revolver in his overcoat pocket.

In search of his wife and McMillian, Hatfield went to several bars, had one drink on the way, then went to the Crystal Lounge, entering by the back entrance, arriving there about mid-

night. His wife was sitting with McMillian in a booth. She noticed Hatfield and waved to him to come over. Hatfield went to the booth and sat next to his wife, facing McMillian. Harsh words were had between Hatfield and his wife about her not coming home and running around with Millian. There was talk of a divorce.

McMillian asked Hatfield to come sit beside him, as he wanted to talk to him as a friend. He tried to explain what he and Mrs. Hatfield were doing together, and tried to convince Hatfield that they had attempted to call him several times that evening. In doing so, McMillian grabbed Hatfield's arm and said: "Sit down, I want to talk to you as a friend". To which Hatfield replied, "You are no friend of mine, you son-of-a-bitch, you are with my wife." After several attempts to get Hatfield to remain seated and after tugging on his overcoat to the extent it partly came off his left shoulder, Hatfield stood up at the end of the booth table, took the pistol from his pocket and fired five shots, two hit McMillian and killed him almost instantly. Hatfield then sat down, put the gun on the table and awaited arrival of the police.

Following his arrest Hatfield gave a statement to the police, stating he "intended to kill him and put him out of his misery." A witness in the booth next to that where the crime occurred testified he heard Hatfield state he meant to kill McMillian.

Defendant urges that during the course of the trial testimony revealed certain facts which gave rise to the possible presence of the defense of self-defense. He states the possible existence of self-defense was not at all apparent during the course of the pretrial investigation.

Accordingly, at the conclusion of the trial defense counsel offered an instruction as to self-defense. The county attorney objected on the ground there was no evidence introduced and no notice of self-defense was given. The trial court refused the offered instruction.

Defendant predicates his appeal to this Court for a reversal of his conviction and the granting of a new trial on the grounds that the notice requirement of section 95-1803(d), R.C.M. 1947, although held constitutional, can be applied unconstitutionally in certain factual situations, particularly those in this case.

Defendant contends the pretrial statements of several witnesses did not contain sufficient facts to show the alleged "violence" and "altercation" between the deceased and himself, and for that reason he could not raise the affirmative defense.

The statement of witness Charles Kuchera was in part:

"Wayne Hysjulien and I met Wally Anderson at the Crystal Lounge about 11:45 p.m. Saturday night the 8th of April, 1972. * * * Roby was doing most of the talking. Eva didn't yell and the other man wasn't saying anything. * * * there is trouble in the next booth * * * right behind us, they are fighting * * * I heard him [Hatfield] say, 'Get your hands off of me and let me go'. * * * I could see that something was going on, like wrestling. * * * I also heard him say [McMillian] to Hatfield 'why don't you shut up, sit down and let me talk to you as a friend' * * *."

At trial, Mr. Kuchera testified in part:

"Q. And when they were having this conversation was the defendant, Mr. Hatfield, sitting beside Mr. McMillian? A. Yes, ma'am.

"Q. Did you see them wrestling? A. Never.

"Q. Did you see Mr. McMillian jerking the defendant? A. I don't think I could classify it as a jerking motion.

"Q. Well, can you tell the Jury what you did see, how it happened? A. I-- As I said, I didn't make myself a spectacle to turn around and stare at the entirety, but when I did turn around I was looking over my shoulder and Mr. Hatfield started to, like he was going to get up, move away, and Mr. McMillian grabbed hold of his shoulder and said, 'Come on, sit down, I want to talk to you.'

"Q. Did he act violent? A. Mr. McMillian?

"Q. Yes. A. No.

"Q. Was he speaking loudly? A. I don't ---Well, it was loud enough that I could hear it, but it was no shout. It was nothing that would have probably caught anyone's or the entire bar's attention, no."

The statement given by witness Walter Anderson was, in part:

"We sat in a booth next to a man and woman and our booth was just west of theirs. * * * I was facing towards the west and could see the back of the ladies head who I have been told was Eva Hatfield. I could not see the man that was sitting across from Eva very well, but I could see that he was wearing glasses and I could see his shoulder. * * * I saw * * * the man Roby, seated on the other side of the booth along side of the man with glasses and his overcoat was pulled off of one shoulder * * * I noticed the coat on Hatfield being pulled down. * * * there was going to be trouble."

Anderson's testimony at trial was, in part:

"Q. Now what kind of trouble were you speaking about when you told the barmaid that there is going to be trouble? A. Well, I just thought that there was going to be a fight or something, I just didn't know what was going to take place.

"Q. When you say fight, do you mean a fist fight? A. Well, some trouble, yes.

"Q. So what you observed in your own mind you were concerned because there might be physical violence in the booth next to you. A. Yes, sir."

The statement given by witness Wayne Hysjulien was, in part:

"When this man first came in, I could tell that he was very angry by the tone of his voice. I heard this man say that he wanted a divorce the next day. * * * Then this man that did the shooting stood up and said I am getting out of here and then this man that was shot pulled him down in the booth. Then this other man said you take your hands off of me right now. * * * Then I heard this man that did the shooting say, 'Take your hands off of me.' I looked over to see what was going on and I saw this man shoot three times but I don't have any idea where the three shots went."

Hysjulien's testimony at trial was:

"Q. Did you observe or hear the defendant's tone of voice that night? A. Yes, it was angry tone of voice.

"Q. Was it loud? A. Not overly loud.

"Q. But you could hear? A. Yes.

"* * *

"Q. What did you hear the defendant say? A. I heard him say that he was a gentleman and he kept his hands off of other women. Also, let's see. That he wanted a divorce the next day or was to get one.

- 5 -

"Q. Was he sitting right beside Eva Hatfield at that time? A. Yes.

"Q. Did the man that got shot, Stanley McMillian, did he say anything that you could hear? A. Only the confirmation of her saying that she had called him.

"* * *

"Q. At what point did the defendant stand up and sit down beside the victim, did you see that? A. Yes, when he said that he wanted to talk to him as a friend.

"Q. Stanley McMillian said that? A. Yes.

"Q. And did you see how he sat down, was he pulled down? A. He was pulled down.

"Q. After he was pulled down beside Stanley Mc-Millian, could you hear any more conversation that went on? A. He said, 'Let go'. He asked him to let go.

"Q. Mr. Hatfield said that? A. Yes.

"* * *

"Q. Did you see the defendant get up and try and get away several times? A. Once.

"Q. You saw him get up only once? A. I saw him only try to pull away once.

"Q. And when he pulled away what did he do? A. He just said to sit down and tried to pull him back down in the booth.

"Q. Was he pulling at the defendant's coat at that time? A. Yes, on the arm of his coat.

"Q. Was he being violent? A. No.

"Q. Did it sound like he was threatening the defendant? A. No.

"Q. Did you see them wrestle? A. No."

Defendant's pretrial statement was, in part:

"About 10:00 p.m., I started getting mad because Eva was not home and about 12:00 I took a .22 revolver and loaded it with 8 rounds of high caliber magnum ammunition. After I loaded the gun, I put it in my righthand overcoat pocket and went out looking for Eva. * * * I walked into the Crystal, I saw Eva with McMillian and she waved at me. I went over and sat down beside her * * * McMillian interrupted us while we were talking and said that he wanted me to sit on his side. I moved over and sat down beside McMillian * * * he grabbed me. I told him to let go, which he did * * * McMillian grabbed me again and released me and the third time that he jerked me; I told him if you do that again, you'll be sorry. I pulled the revolver out of my

pocket and shot him. I was not trying to hurt him, and I shot him until he was dead. I intended to kill him and put him out of his misery."

At trial defendant testified in part:

"A. * * * I got up and started to go and he said, 'Why don't you sit down over here with me and talk?' * * * So I sat down over there and he started to grab ahold of my arm and coat and jerked me over toward him and not too roughly, but rough enough so he bothered up my coat, and my arm * * *.

"Q. How did he jerk you over there, Mr. Hatfield? A. Well I would say that the first time that he just took ahold of my coat and sleeve and arm and pulled it. * * * the first time wasn't too mild. The second time was quite violent, and I would say much more than was necessary at all * * * I said, 'I don't care for you. * * * I don't want to hear anything you have got to say at all. * * * There is nothing that you could possibly tell me that would interest me for five minutes. * * * If you keep on bothering me you are going to be more than sorry', and the third time when he pulled me over to him why he got his arm around my neck sort of in a twisting ugly hold, you might call it, and jerked me over to him violently and well, you might call it roughhouse * * * and pulled me over to him very violently and very crudely and I was quite surprised. I said, 'Okay, that's the way you feel about it,' so I got up, unlatched my coat, took out my gun and shot him."

We fail to see where the testimony at trial made a better case for self-defense than did the pretrial statements. Neither revealed "violence" or an "altercation" to the extent that Hatfield acted under the influence of a reasonable fear that someone was going to be murdered or seriously injured. There was no evidence from witnesses for the state that Hatfield did the killing in fear, nor did he himself testify that he acted under any fear of harm.

In State v. Brooks, 150 Mont. 399, 410, 436 P.2d 91, this Court had the same issue before it. There we said:

"Under Montana law if a homicide is to be justified by self-defense there must be evidence that the party killing acted under the influence of a reasonable fear that someone was going to be murdered or seriously injured. [Citing authorities] In this case there is no evidence whatever that the defendant acted under a reasonable apprehension of death or great bodily harm. The witnesses for the State gave no indication that the defendant did the killing in fear nor did the defendant himself claim that he acted under any fear of harm.

- 7 -

> "Instructions must have relation to the facts
> given in a particular case. State v. Evans, 60
> Mont. 367, 199 P. 440. Although instructions may
> state a correct principle of law, if they are not
> based upon or in conformity with the issues or
> facts raised or supported by the evidence they
> ought not to be given. State v. Smith, 57 Mont.
> 563, 190 P. 107; State v. Mitten, 36 Mont. 376,
> 92 P. 969. In this case Judge McClernan was
> correct in refusing to instruct on self-defense."

In State v. Eisenman, 155 Mont. 370, 374, 472 P.2d 857, the defendant did give notice of intention to rely on self-defense pursuant to section 95-1803(d), R.C.M. 1947. Defendant there offered several instructions on self-defense. The trial court refused them on the grounds that there was no evidence presented that supported such a theory. This Court affirmed the district court, saying:

> "According to appellant's own version, she saw her
> husband waving a gun in their home and looking
> 'goofy'. She testified that she tried to disarm
> him and in the ensuing scuffle and wrestling match,
> he was shot five times! At best she was claiming
> accidental shooting. She never claimed that she
> shot in defense of anything. There simply is no
> evidence supporting a self-defense theory."

For the foregoing reasons we cannot agree with defendant's contention. After careful reading of the transcript and statements, we find the undisputed facts prove that defendant could not have availed himself of the defense of self-defense.

Having found no issue of self-defense, the claim of unconstitutionality as to section 95-1803, R.C.M. 1947, is not before us. However, for a discussion of this matter see: State ex rel. Sikora v. District Court, 154 Mont. 241, 462 P.2d 897; State v. Bentley, 155 Mont. 383, 472 P.2d 864; State ex rel. Krutzfeldt, _____Mont._____, _____P.2d _____, 30 St.Rep. 993; Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L ed 2d 446; Radford v. Stewart, 320 F.Supp. 826, 472 F.2d 1161, Wardius v. Oregon, ___U.S. ____, 93 S.Ct._____, 37 L ed 2d 82 (1973).

The judgment of conviction is affirmed.

Hon. Edward T. Dussault, District
Judge, sitting for Justice John
Conway Harrison.

- 8 -

We Concur:

_James T. Harrison_
Chief Justice

_Gene B. Daly_

_Wesley Castles_

_Frank I. Haswell_
Justices.