No. 13011

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

DUNCAN PEDER McKENZIE, JR.,

Defendant and Appellant.

---

Appeal from: District Court of the Eighth Judicial District, Honorable R. J. Nelson, Judge presiding.

Counsel of Record:

For Appellant:

Barney Reagan argued, Cut Bank, Montana
Charles L. Jacobsen argued, Conrad, Montana

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena, Montana
John F. North, Assistant Attorney General, argued, Helena, Montana
Douglas Anderson argued, County Attorney, Conrad, Montana

---

Submitted: September 3, 1976

Decided: NOV 18 1976

Filed: JR

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal is from the district court, Cascade County, following a jury verdict of guilty to the crimes of deliberate homocide and aggravated kidnapping. Punishment under the codes of Montana for each crime: death.

Lana Harding was a 23 year old rural school teacher in Pondera County. On the morning of Tuesday, January 22, 1974, she failed to appear at school. At the Pioneer School teacherage, where she lived, the bed was found in a disheveled condition. The sheriff of Pondera County was called and officers were dispatched to the school, arriving there mid-morning.

Investigation that day revealed (1) a red tennis shoe belonging to Lana just outside the school, (2) a drag trail from the teacherage to a nearby road, (3) blood near the end of the drag trail (later identified as Lana's type and Rh factor), and (4) a wristwatch belonging to Lana was found in the same area as the blood. Lana Harding was last seen in Conrad, some thirteen miles from the teacherage, on Monday, January 21, 1974 at about 5:00 p.m.

Defendant had recently moved into the community and was working for the K & K Wholesale Seed Co. located approximately three miles from the Pioneer School teacherage. Within a day or so before January 21, defendant made arrangements to buy a 1948 black Dodge pickup, recognizable to most inhabitants of the area due to the fact it had belonged to one owner for a long period of time. On January 21, 1974, defendant worked on the pickup after work. He was seen leaving the K & K Wholesale Seed Co. at approximately 6:45 p.m., driving the black pickup and headed towards his

place of residence, which was not far from the teacherage. The pickup was seen about 7:00 p.m. about a mile from the teacherage.

Approximately an hour and twenty minutes later, at about 8:00 p.m., defendant knocked on the door of the Pearson farm residence, located across the road from the teacherage. He asked for assistance in starting his Dodge pickup. It was later determined the pickup was parked on the road where the drag trail ended and where the blood and watch were found on the following day, January 22. At the Pearson residence defendant asked directions to his own residence and from there called his wife to say he was coming home. Don Pearson pulled the pickup and got it started and later noted defendant did not drive on to his place of residence. Shortly thereafter the pickup was seen being driven toward the drill site where the body was later located.

On the morning of January 23, Wednesday, the body of Lana Harding was found at a location called the "drill site" in the area of K & K Wholesale Seed Co. The body was clothed only in a shirt, sweater and bra and it was draped over the tongue of a grain drill. She had been severely beaten about the head and body. The forensic pathologist who examined the body testified the death blow was one that was delivered to the head and laid open the right side. A rope was tied around her neck and there was evidence she had been strangled with it but pressure had been released so she did not die of strangulation. Entangled in her hair was a coil of wire, later shown to have come from a roll of wire found in the back of the Dodge pickup.

In the course of the search for the body and the investigation of the murder a number of items were found and later received into evidence that were incriminating against defendant:

- 3 -

1) A pair of gloves worn by defendant at work on January 21 and found in a field not far from where the body was discovered, the gloves had human blood on them.

2) Overshoes found about a quarter mile away had type O human blood and brain tissue on them, impressions on the soles matched the heels of the boots later taken from defendant's home.

3) Lana Harding's purse was found near where the overshoes were recovered.

As a result of the investigation by the sheriff and his deputies, late on the afternoon of Tuesday, January 22 the county attorney filed a complaint before the justice of the peace and obtained a warrant for the arrest of defendant and a search warrant.

Thereafter, defendant was arrested on an assault charge at his home. The Dodge pickup was seized and impounded. Human blood was found in the bed of the pickup and on the springs; the back end of the pickup had been recently sprayed with black paint; the spray paint was identified by F.B.I. experts as identical to a spray paint brand named "Weekend". This brand was not available in the Conrad area. A can of the black spray paint was found in the cab of the pickup and another was later found at defendant's home.

After seizing the truck and taking it to Conrad, several items were found in the back of the pickup. A coil of wire, later identified by F.B.I. experts as having been connected to and broken away from the coil of wire found in deceased's hair; and an exhaust manifold that had been painted black. On the manifold was found human blood of the same type and Rh factor as Lana's along with brain and cortical tissue. Dr. John Phaff, who

examined the body and the manifold testified the manifold could have inflicted the fatal blow.

At the drill site, where the body was found, a piece of brass from a water pump was found. The prior owner of the Dodge pickup testified this piece of brass was in the back of the pickup when defendant took possession of it on January 19, 1974.

Several co-workers at the K & K Wholesale Seed Co. testified at trial that defendant on January 21 had said he broke in every new vehicle by engaging in sexual intercourse in the newly acquired vehicle. Several days before he said he had intercourse with country school teachers; that they were naive, he could teach them, and they were easy to get.

Defendant appeals his conviction of guilty and presents 25 issues on appeal in an unprecedented brief of over 500 pages accompanied by two volumes of appendixes, plus a 75 page reply brief. Also filed was an amicus curiae brief from the NAACP on the death penalty. For the purpose of clarity and brevity the 25 issues will not necessarily be discussed in order, some will be consolidated, but all will be considered. The 25 specifications of error listed by defendant are:

1. The court erred in denying defendant's motion to suppress and in holding section 95-1806(f), R.C.M. 1947, constitutional.

2. The court erred in refusing to grant defendant's motion to withdraw plea or defendant's motion to enforce plea bargaining agreement of December 23, 1974.

3. The court abused its discretion in requiring defendant to put witnesses on out of order and erred in refusing defendant's proposed exhibits # 1-12, 13A,13B, 14 -23, 24, 24A,25, 25A, 27, 28, 30 and 31.

4. The erred in admitting into evidence state's exhibits # 6 - 11, which were postmortem photographs of the victim's body.

5. The trial court erred in admitting state's exhibit #97, over defendant's objection.

6. The court erred in allowing persons in the audience to record the closing argument of counsel for the state, over objection.

7. The court erred in granting the state's motion to endorse 58 additional witnesses on the amended information on the first day of trial.

8. The court erred in not enforcing its own order requiring the state to furnish defendant with the statements of its witnesses.

9. The court erred in allowing experts to testify as to results of tests run on items which were subsequently admitted into evidence, and erred in admitting opinion testimony concerning proposed exhibits not yet admitted into evidence.

10. The court erred by refusing to grant defendant's motions to disqualify district judges.

11. The court erred in allowing the state to file its amended informations and denied defendant a speedy trial.

12. The court erred in defining "torture", giving the question of torture to the jury; and defendants rights were prejudiced by giving Instructions # 23,29 and 54.

13. The court erred in giving preliminary instructions numbered 1 through 28, over objection.

14. The court erred in giving of additional instructions 29 through 54, over objection. The court erred in directing the use of statutory presumptions to supply proof of material elements of the offenses charged.

15. The court erred in submitting to the jury verdict forms not in accordance with the requirements of the law.

16. The court erred in refusing defendant's proposed instructions.

17. The court erred in denying defendant the right to allow defendant to voir dire on mental disease or defect.

18. The court erred in refusing to allow the defendant's psychiatrist to be present in the courtroom during the testimony of the state's rebuttal witnesses.

19. The court erred in denying defendant's "Amended Motion for Protective Order and Other Appropriate Relief" and in holding section 95-1803 constitutional.

20. The evidence presented at trial does not support the verdicts.

21. The court erred by basing its judgment and sentence upon an erroneous "Findings, Conclusions, Sentence and Order".

22. The court erred by refusing to grant defendant's motion for a new trial.

23. The trial court erred in adopting or demonstrating a partisan attitude toward defendant, thereby denying him a fair trial.

24. The doctrine of cumulative error constitutes reversible error, by denying defendant a fair trial.

25. The court erred in imposing the sentence of death.

At the outset, we consider the contention that the assessment of the death penalty violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the 1972 Montana Constitution.

While the original briefs of the state and defendant relied on Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L ed 2d 346 (1972) arguments, later briefs received by this Court rely on five United States Supreme Court cases released on July 2, 1976, covering punishment statutes of five states: 1) Gregg v. Georgia, 44 U.S. L.W. 5230; 2) Proffitt v. Florida, 44 U.S.L.W. 5256; 3) Jurek v. Texas, 44 U.S.L.W. 5262; 4) Woodson v. North Carolina, 44 U.S.L.W. 5267, and 5) Roberts v. Louisiana, 44 U.S.L.W. 5281. Therefore, we will discuss Montana's statutes in light of the holdings in the five listed United States Supreme Court cases.

Following Furman Montana enacted its new criminal code of 1973, which revised its capital punishment statutes to provide a mandatory death sentence for the crimes of "deliberate homocide" and "aggravated kidnapping", unless the trial court found "mitigating circumstances". These Montana statutes were in effect on January 21, 1974, the date of the kidnap murder of Lana Harding:

"94-5-102. Deliberate homicide. (1) Except as provided in section 94-5-103 (1)(a), criminal homicide constitutes deliberate homicide if:

"(a) it is committed purposely or knowingly; or

"(b) it is committed while the offender is engaged in or is an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnaping, felonious escape or any other felony which involves the use or threat of physical force or violence against any individual.

"(2) A person convicted of the offense of deliberate homicide shall be punished by death as provided in section 94-5-105, or by imprisonment in the state prison for any term not to exceed one hundred (100) years."

"94-5-103. Mitigated deliberate homicide. (1) Criminal homicide constitutes mitigated deliberate homocide when a homicide which would otherwise be deliberate homicide is committed under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse. The reasonableness of such explanation or

or excuse shall be determined from the viewpoint of a reasonable person in the actor's situation.

"(2) A person convicted of mitigated deliberate homicide shall be imprisoned in the state prison for any term not to exceed forty (40) years."

"94-5-104. Negligent homicide. (1) Criminal homicide constitutes negligent homicide when it is committed negligently.

"(2) A person convicted of negligent homicide shall be imprisoned in the state prison for any term not to exceed ten (10) years."

"94-5-105. Sentence of death for deliberate homicide. (1) When a defendant is convicted of the offense of deliberate homicide the court shall impose a sentence of death in the following circumstances, unless there are mitigating circumstances:

"(a) The deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison; or

"(b) The defendant was previously convicted of another deliberate homicide; or

"(c) The deliberate homicide was committed by means of torture; or

"(d) The deliberate homicide was committed by a person lying in wait or ambush; or

"(e) The deliberate homicide was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

"(2) Notwithstanding the provisions of subsection (1) and regardless of circumstances, when a defendant is convicted of the offense of deliberate homicide under subsection (1)(a) of section 94-5-102 in which the victim was a peace officer killed while performing his duty the court shall impose a sentence of death."

The provision of section 94-5-304, R.C.M. 1947, providing for the "mitigating circumstances" was amended out of the statute by Sec. 1, Ch. 126, Laws of 1974. The amendment became effective March 11, 1974 and was not in effect at the time of the death of Lana Harding. Under Montana's capital punishment statutes the jury determines whether the defendant is guilty of a crime for which

the death penalty may be imposed, leaving to the trial judge the imposition of the sentence after consideration of "mitigating circumstances".

Following the jury's verdict in the instant case, the trial judge ordered and received a presentence investigation report and thereafter heard defendant's motion for mitigation. The sentencing procedure in Title 95, Chapter 22, R.C.M. 1947, requires the individual characteristics of the person convicted be considered. Review of the sentence imposed is provided for by Title 95, Chapter 25, R.C.M. 1947. In the trial court's findings of fact regarding defendant's motion for mitigation, the court held:

> "2. That both of the offenses of which the defendant has been found guilty are of equal gravity and seriousness under the law, both being mandatorily punishable by death, unless there are mitigating circumstances.
>
> "3. That there is nothing in the evidence of the case, nor in the presentence investigation, nor in the character, nature, or background of the defendant, nor in any other manner presented to the Court which mitigate his conduct or the sentence required by law.
>
> "* * *
>
> "8. That the prognosis for change in and rehabilitation of persons with anti-social personality disorders such as defendant's is so unlikely and minimal as to be practically non-existent.
>
> "9. That the defendant must never be allowed to be free in and endanger society again * * * [or] be turned loose to menace society again * * *."

On appeal defendant argues that the death sentence here imposed violates his constitutional rights because there was no jury participation of any kind in the determination of the sentence. He cites in support the five United States Supreme Court cases decided July 2, 1976, heretofore listed, and Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L ed 2d 630; Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L ed 2d 776; Furman v. Georgia, supra.

We turn now to consideration of the above cited cases in applying them to Montana's statutes with particular emphasis on the question of whether "jury participation in the sentence" is a necessity for constitutionality. This Court has long held that the presumption of constitutionality attaches to all statutes coming before this Court. State v. Parker, 161 Mont. 394, 506 P.2d 850; State v. Henrich, 162 Mont. 114, 509 P.2d 288; Harrison v. City of Missoula, 146 Mont. 420, 407 P.2d 703.

The United States Supreme Court in Gregg v. Georgia, 44 U.S.L.W. 5230, 5234, 5242, held "the punishment of death does not invariably violate the Constitution." It then said, referring to its decision in the early case of Furman:

> "In summary, the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."

Following the Furman decision Montana revised its capital punishment statutes to be in compliance with the holding in that case.

Considering the three state statutes in the cases upheld by the United States Supreme Court, we find the provisions of the Texas statute come closest to sections 94-5-105 and 94-5-303, R.C.M. 1947. Texas, as noted in Jurek v. Texas, 44 U.S.L.W. 5262, 5263, 5266, provides for a bifurcated sentencing procedure in which the jury is the sentencing authority and it must answer two (sometimes three) questions which in effect go to aggravation:

1. Whether the conduct of defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

2. Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing

- 11 -

threat to society; and

3. If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

The Court in _Jurek_ then went on to observe that any law allowing the sentencing authority to consider aggravation only would not meet constitutional standards. It observed that in answering the second question the question of mitigation was presented and held:

> "We conclude that Texas' capital-sentencing procedures, like those of Georgia and Florida, do not violate the Eighth and Fourteenth Amendments. By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first-degree murder case before a death sentence may even be considered. By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law."

While the Montana statutes do not provide for the jury in the bifurcated sentencing procedure, we find they are within the _Gregg_ and _Jurek_ decisions. Under Montana statutes the sentence of death in the instant case was rested to a narrowly defined type of murder or kidnapping. The statute provided the sentencing judge consider mitigating circumstances. In addition, appellate judicial review is provided.

We note further, in considering mitigation, that Montana has the Sentence Review Division which reviews all sentences at the request of the defendant. The Sentence Review Division of the Supreme Court is provided for by Chapter 25 of the Code of

- 12 -

Criminal Procedure and includes sections 95-2501 through 95-2504, R.C.M. 1947. Pursuant to the above this Court activated the Sentence Review Board on December 1, 1967. Since its inception it has been composed of three (3) district court judges and the statute provides that no judge may sit on a case before the Board in which he was the sentencing judge. Under the provisions of Montana law a person convicted is immediately made aware of his right to appear before the Board and a schedule is set up for his appearance, with counsel if desired. The Board may affirm, decrease or increase the sentence. Also, Chapter 26, of Montana's Code of Criminal Procedure provides for post-conviction hearing. Section 95-2608, R.C.M. 1947, permits an appeal to this Court by either the petitioner or the state. See: State v. Simtob, 154 Mont. 286, 462 P.2d 873; State v. Henrich, 162 Mont. 114, 509 P.2d 288; State v. Heyward, 152 Conn. 426, 207 A.2d 730; Anno. 168 A.L.R. 706.

Directing our attention to the judicial sentencing, and defendant's argument against it, we find that no prohibitions in any of the five cases appear against judicial sentencing. While the United States Supreme Court speaks to the desirability of a bifurcated jury sentencing, it speaks clearly in Proffitt v. Florida, 44 U.S.L.W. 5256, 5259 about judicial sentencing. It held:

> "The basic difference between the Florida system and
> the Georgia system is that in Florida the sentence is
> determined by the trial judge rather than by the jury.
> This Court has pointed out that jury sentencing in a
> capital case can perform an important societal function,
> Witherspoon v. Illinois, 391 U.S. 510, 519 n.15, but it
> has never suggested that jury sentencing is constitutionally
> required. And it would appear that judicial sentencing
> should lead, if anything, to even greater consistency
> in the imposition at the trial court level of capital
> punishment, since a trial judge is more experienced in

sentencing than a jury, and, therefore is better able to impose sentences similar to those imposed in analogous cases."

Footnote 10, appended to the above quote reads:

"See ABA Standards Relating to Sentencing Alternatives & Procedures §1.1, Commentary, pp. 43-48; President's Comm'n on Law Enforcement & Administration of Justice: The Challenge of Crime in a Free Society, Task Force Report: The Courts 26 (1967). See also Gregg v. Georgia, ante, pp. 32-33. In the words of the Florida Court, 'a trial judge with experience in the facts of criminality possesses the requisite knowledge to balance the facts of the case against the standard criminal activity which can only be developed by involvement with the trials of numerous defendants.' State v. Dixon, 283 So.2d, at 8."

Here, defendant argues that Article II, Section 28, 1972 Montana Constitution no longer expressly authorizes the legislature to provide for the death penalty as did Article III, Section 24, 1889 Montana Constitution. The failure to reenact the authorization might have significance had not the Constitutional Convention given the people of Montana the option of adopting into the 1972 Constitution language expressly prohibiting the enactment of the death penalty. The people of Montana voted for 147,023 and against 77,733, to retain the death penalty. Such a vote, so recently, negates any argument the death penalty violates contemporary standards of decency.

Defendant argues that even if a judicial sentence procedure is approved, that Judge Nelson failed to follow the criteria found necessary to consider before approving a death sentence. We do not agree.

As previously noted, this case was tried prior to the United States Supreme Court's latest considerations of the death penalty, and therefore before any set pattern of matters that a jury must consider in death cases, here Judge Nelson did, in his findings, consider in general those matters the Supreme Court found necessary.

A reading of the findings clearly shows the conduct of the defendant that caused the death was done deliberately, with reasonable expectation that death would result. He used a rope around her neck that could have killed the victim had he not crushed her head with instruments he had in the truck---all done in a sexual attack on the victim.

Judge Nelson, prior to sentencing, had a thorough presentence report compiled on defendant which indicated this was not his first encounter with the law. Defendant was a former parolee at the time of the murder having been convicted in 1970 of the crime of aggravated assault on another woman. That woman was found brutally beaten, clad only in a blouse crawling alongside a road. Defendant received a three year sentence for that crime, was paroled after some six months in the prison, but returned to prison after numerous parole violations. In 1972 he was again paroled as safe to be at large in society. That parole had expired three months before the present crime. The findings and conclusions found no circumstances that mitigated defendant's conduct. In addition, Judge Nelson found defendant should never be allowed to be free in and endanger society again.

While there is no specific finding there was no provocation, none was ever alleged. The findings note that the conduct of defendant in killing Lana Harding was unreasonable, and without any mitigating circumstances.

While we have referred solely to the holding in Jurek v. Texas, 44 U.S.L.W. 5262, we call attention to the opinion in Gregg v. Georgia, 44 U.S.L.W. 5230, wherein the United States Supreme Court approved a bifurcated procedure in Georgia. There the state supreme court approved the death penalty in an armed robbery and

murder case where the trial judge, at the penalty stage, instructed the jury it could recommend either a death or life imprisonment sentence on each count. Further, the jury was free to consider mitigating or aggravating circumstances, if any, as presented by the parties, and that the jury could not impose a death sentence unless it first found beyond a reasonable doubt (1) that the murder was committed while the offender was engaged in the commission of other felonies (i.e. armed robbery); (2) that he committed the murder for the purpose of receiving the victim's money, or (3) that the murder was "outrageously and wantonly vile, horrible and inhuman" in that it "involved the depravity of the mind of the defendant". In Gregg the jury found the first and second of these aggravating circumstances and returned a sentence of death. Here, the trial judge found all three (1) that the murder was committed in the commission of a felony; (2) a sexual attack on the victim, and (3) "it was a brutal, conscienceless, torture rape and deliberate killing of a human being."

We note too, that this Court looks at the total record during its review to determine whether the sentence was influenced by passion, prejudice or any other arbitrary factor; whether the evidence supports the finding of a statutory aggravating circumstance; and, whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We affirm, as did the Supreme Courts of Georgia, Florida and Texas in the most recent United States Supreme Court cases.

We find no merit to defendant's argument that Article II, Section 22, 1972 Montana Constitution prohibits the death penalty as cruel and unusual punishment. First, the vote of the people of

- 16 -

Montana indicated that they did not intend by ratifying the 1972 Constitution, that any section thereof would abolish the death penalty. In addition, a majority of the United States Supreme Court in Gregg did not find the imposition of the death penalty to be "cruel and unusual punishment".

We next discuss defendant's issue on probable cause. This issue is broken down into six sub-issues by defendant:

1. Was there probable cause for the arrest and search warrant to issue?

2. Were the facts supporting probable cause made under oath or affirmation and reduced to writing?

3. Was the search warrant a general warrant?

4. Was there a consent search or a search incident to arrest?

5. Is section 95-1806(f), R.C.M. 1947, constitutional?

6. Was defendant entitled to suppression?

We find no merit in defendant's contention there was no probable cause for the arrest or search warrant. This Court in State ex rel. Garris v. Wilson, 162 Mont. 256, 511 P.2d 15, considered federal case law and the long standing rule in this jurisdiction on probable cause for arrest and search warrants, noting:

> "'We reach this decision by application of the following standards: only a probability of criminal conduct need be shown.'"

Far more was shown here! See: State v. Troglia, 157 Mont. 22, 482 P.2d 143; Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L ed 2d 637.

Defendant argues the search warrants must fall on the basis of failure on the part of the county attorney to swear or

affirm and reduce the testimony to writing. He relies on State ex rel. Townsend v. Dist. Ct., _____Mont._____543 P.2d 193, 32 St.Rep. 1163; and Petition of Gray, 155 Mont. 510, 473 P.2d 532. We find neither case factually applicable here.

Article II, Section 11, 1972 Montana Constitution, provides:

> "* * *No warrant to search any place, or seize any person or thing shall issue * * * without probable cause, supported by oath or affirmation reduced to writing."

In Townsend nothing was reduced to writing. Here, there is an affidavit signed by the county attorney and made a part of both warrants. At a later date, defendant argues the justice of the peace failed to follow the rituals of the swearing. County Attorney Nelson later testified he asked the Justice of the Peace "if he was sworn."

Defendant argues the county attorney made the affidavit only facts obtained from Jerry Hoover, a deputy sheriff of Pondera County, who had been at the scene of the crime as part of the investigating team. This is not a true picture of what took place before Justice of the Peace Wolfe at the time the county attorney gave the affidavit and obtained the warrants. On September 30, 1974, a hearing on the defendant's motion to suppress was held before Judge Robert J. Nelson. Testifying were Sheriff Hammermeister, his deputy, Jerry Hoover, Justice of the Peace Robert Wolfe and County Attorney David H. Nelson. The arguments of defendant's counsel were directed to the lack of probable cause for the issuance of the warrants.

A summary of the testimony shows Justice of the Peace Wolfe testified he customarily swears all witnesses though he did not recall swearing in the county attorney, he considered him sworn.

Deputy Hoover testified he came into town about 4:30 p.m. on January 22, 1974, with directions to go to the county attorney's office; that he helped the county attorney prepare the affidavit and he then went before Justice of the Peace Wolfe and gave sworn testimony in support of the issuance of the warrants. County Attorney Nelson testified he had been at the scene with the sheriff and his deputies during the afternoon and just prior to his coming to town to get the warrants issued. At the hearing, he said in answer to a question of what knowledge he had of the facts:

> "A. Well, without looking at the affidavit now
> ---I think the first paragraph or two is my state-
> ment as to what I determined, that she was missing
> and may have been the victim of foul play but of
> what nature we didn't know at the particular time,
> and that she resided at the teacherage."

In addition, the county attorney examined Deputy Hoover before the Justice of Peace as to facts he learned during the investigation. Here, unlike Gray there was sworn testimony by the county attorney and deputy sheriff in addition to the affidavit and the combination thereof established probable cause. The fact that defendant had been parked at the roadside near the school the night before had been established by the Pearsons, who assisted defendant in getting the truck moved. It was there that the victim's watch was found in a pool of blood by the investigating officers before going to town to get the warrants. See: Lindley v. State, Okl.Cr.(1956), 294 P.2d 851.

This, in our opinion is a sufficient showing of probable cause to issue the warrants.

Defendant next attacks the specificity of the search warrant, alleging that under the search warrant issued, a blanket seizure resulted. Examination of the warrant indicates that both the

house and the vehicle were to be searched. Though an error on the vintage of the black Dodge pickup (1950 instead of 1948) appeared, that is of little significance. State ex rel. Flournoy v. Wren, 108 Ariz. 356, 498 P.2d 444. All parties knew the pickup involved. All that is needed to meet the requirements of specificity is that the officer with reasonable effort, can ascertain the automobile intended to be searched, and its owner, if possible. Wangrow v. United States, 399 F.2d 106. Defendant cites case authority that some seven criteria are needed for identification of a motor vehicle--owner, make, model, year, color, motor number and license number. Here the affidavit for the search warrant answers five of the seven listed criteria and it was sufficiently specific. Wilkerson v. Commonwealth, 200 Ky. 399, 255 S.W. 76; Hatley v. State, 72 Okla. Cr. 69, 113 P.2d 396.

Defendant's argument that the items seized were not covered by the language "any other contraband articles", is without merit. The language used comes within the holding of this Court in State v. Quigg, 155 Mont. 119, 467 P.2d 692.

Next we consider the constitutionality of section 95-1806(f), R.C.M. 1947, which states:

"The burden of proving that the search and seizure were unlawful shall be on the defendant."

We find no merit in defendant's contention this subsection is unconstitutional. We note defendant cites no authority for his position and therefore fails to overcome the presumption of constitutionality. United States v. Keleher, 2 F.2d 934, relied upon by defendant, is not applicable to the facts here. We note that Montana's statute section 95-1806(f), R.C.M. 1947, is patterned after Chapter 38, § 114-12(b), Ill. Code of Criminal Procedure, which states in part:

"* * * The judge shall receive evidence on any
issue of fact necessary to determine the motion
and the burden of proving that the search and
seizure were unlawful shall be on the defendant * * *."

Here, such a hearing was held by the trial court and defendant

failed in his effort. People v. Normant, 25 Ill.App.3d 536, 323

N.E.2d 553; State v. Tritz, 164 Mont. 344, 522 P.2d 603.

For the purpose of brevity we will combine and discuss

defendant's specifications of error 10 and 20 together, in view

of the fact they are directed at the alleged partiality of the

trial court and its failure to grant a new trial due to insuffi-

ciency of the evidence.

This was a protracted pretrial case. The case began

officially in the district court of the ninth judicial district,

county of Pondera, on January 24, 1974. Some 89 docket entries later,

the case was sent to Cascade County on December 4, 1974 on a

motion for change of venue. During this period Judge McPhillips

presided until September 19, 1974 when he was disqualified and

Judge Nelson of the eighth judicial district, Cascade County,

assumed jurisdiction. The first entry in the record of the eighth

judicial district is December 6, 1974, the last is numbered 181

and dated December 9, 1974. We call attention to this record

in view of the attack made on the partiality of Judge Nelson.

Defendant used his only motion for substitution against the original

trial judge and now complains that he got in that judge's place

a judge whose "extrajudicial knowledge" made him biased and pre-

judiced. To this argument we find no merit.

Judge R. J. Nelson was and is one of the senior trial

judges of this state. He came to the bench in 1957 after an

active career as a trial attorney. He was one of three district

judges chosen to serve on the legislative authorized committee that completely revised the substantive and procedural criminal law of this state, a task that took some ten years. He has been the senior judge in his district for most of his judicial career and serves in one of Montana's busiest judicial districts.

Here, Judge Nelson, of necessity, had to hear and consider many motions and make rulings and the fact that he did not please defendant does not indicate bias and prejudice against defendant. The presumption is that his rulings were correct or they would have come to this Court's attention. His membership on the Criminal Law Commission indicates a willingness to perform an affirmative obligation of judicial officers to work for the improvement of the law and judicial administration. His activities come within the Canons of judicial conduct.

Defendant next argues Judge Nelson should have disqualified himself in that he gained extrajudicial knowledge of the case from plea bargaining, citing United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L ed 2d 778. That case is not applicable for to establish bias or prejudice under the holding of Grinnell the judge's opinion as to the merits of the case had to come from some source other than the knowledge obtained from the judge's participation in the case. Here, whatever knowledge Judge Nelson gained was during the course of this case.

We find Judge Nelson correctly construed the law and in the motions where he ruled against defendant, there is no bias indicated.

We have held in numerous cases in weighing the sufficiency of the evidence that the court is not the trier of the fact, the jury is, and following conviction if there is substantial evidence

to support the judgment the presumption is in favor of the judgment. State v. Stoddard, 147 Mont. 402, 412 P.2d 827; State v. White, 146 Mont. 226, 405 P.2d 761; State v. Gleim, 17 Mont. 17, 41 P. 998. Here there is abundant evidence to support the verdict.

Specifications of error 6 and 24 appear to be a shotgun attempt in defendant's attack on Judge Nelson in his effort to "cumulate" a record of alleged errors that would lead this Court to reverse and order a new trial. During closing arguments, in what defendant calls a "partisan audience", tape recordings were taken. Defendant objected but Judge Nelson did nothing to stop the recording. Defendant fails to convince this Court, and failed to convince the trial court, that such activities on the part of persons in the audience violate any canon of judicial conduct or merit further consideration of the matter by this Court.

Defendant's specification of error 24 argues, in his words, whether alleged error which might be termed "harmless error" cumulated into prejudicial error?

Defendant alleges the doctrine of cumulative error was established in Chapman v. California, 386 U.S. 18, 21, 87 S. Ct. 824, 17 L ed 2d 705, 709; Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L ed 790; Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L ed 1557. He also argues the concepts of "harmless error" and "cumulative error" are interrelated and should be applied here.

Defendant begins his argument on appeal noting that he has set forth 25 specifications of error, his brief is 514 pages in length, with an appendix of some 800 pages. He then states if he had set forth all of the error, the brief would have been absurd. He then admits to "plowing ground" but argues such should

not detract from the thesis and legal effect. This argument is without merit for we find no reversible error.

Defendant's specification of error 4 and 5 object to certain photographs which were introduced into evidence as being gruesome and inflammatory or otherwise prejudicial.

The basic rule on photographic evidence in Montana as stated in State v. Campbell, 146 Mont. 251, 261, 405 P.2d 978, is:

> "* * * Photographs are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 P.2d 1025. When the purpose of an exhibit is to inflame the minds of the jury or excite the feelings rather than to enlighten the jury as to any fact, it should be excluded. State v. Bischert, 131 Mont. 152, 308 P.2d 969 * * *."

Here, the photographs in question fall into three categories: 1) photographs of the body taken at the "drill site"; 2) autopsy photographs taken by the pathologist; and 3) a single photograph of a can of spray paint in a suitcase.

In each instance these photographs meet the above test, they were relevant and were useful and necessary in explaining the evidence and assisting the court and jury in understanding the case. (1) The photographs taken at the site where the body was found were used by the pathologist to show creases in the body which were not present after the body had been moved and which tended to show how long the body had been at the site. 2) The autopsy photographs, taken in color and then printed in black and white, were used by the pathologist to show the nature of the wounds and explain the evidence which formed the basis of his opinion as to the size and configuration of the weapon which was used to inflict the wounds. 3) The photograph of the can of spray

paint in the suitcase was used to show the defendant had in his possession a type of paint which was not available in the area stores. Defendant finds prejudice from this photograph in the implication of flight that could arise from the fact the paint was in a suitcase. Defendant had been in custody for some time prior to the time these photographs were taken. This alleged prejudice could have been easily explained away in cross-examination, and there was no intent to excite feelings with this photograph which was in no way gruesome. It was properly admitted.

Defendant argues in specification of error 2 that there was an enforceable plea bargain made and requests that it be specifically performed. As the factual basis of this argument defendant alleges counsel for the state and defendant met and concluded that a guilty plea would be entered to deliberate homicide and aggravated assault with a 50 year and 20 year sentence to be imposed respectively. The next day counsel met with the presiding judge and obtained his approval. A date, about a week later, was set for the entry of the plea of guilty. A few days prior to the day set for entry of the plea, defendant was informed the deal was off. The state agrees with the basic factual description of the events, except that it states it was always its intent to get the reaction of the victim's parents and the sheriff before making any final agreement and no bargain would be completed without the approval of these parties. This approval was not obtained and defendant was notified the deal was off.

Defendant argues that Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L ed 2d 427, stands for the proposition that plea bargains are enforceable. There a plea had been entered.

- 25 -

Santobello is not applicable, for the fact situation is far different than here. Specification of error 2 is without merit.

Defendant's specifications of error 3, 7, 8 and 9 allege 1) the failure on the part of the court to enforce its order relating to the giving of copies of witness' statements to the defendant, 2) prejudice arising from the addition of 58 new witness' names to the Information on the day of trial, 3) prejudicial interference with the order of the presentation of defendant's case, 4) failure in the chain of possession of evidence and prejudice arising from the presentation of expert opinion prior to the introduction into evidence of the evidence which was the basis for that expert opinion. These specifications are factually interrelated and must be viewed against the basic policies and the structure of the Montana Code of Criminal Procedure.

That code in sections 95-1801(d)(1), (d)(2) and 95-1804(a), R.C.M. 1947, provide the basic discovery tools. Section 95-1804(a), provides:

> "On motion of a defendant in any criminal case made prior to trial the court shall order the state to furnish the defendant with a copy of any written confession or admission and a list of the witnesses to its making. If the defendant has made an oral confession or admission a list of witnesses to its making shall be furnished."

This provision by its mandatory language entitles the defendant as a matter of right, upon motion, to statements he made. It requires no showing of good cause.

Section 95-1801 (d)(1), provides:

> "Upon motion of either party and upon showing of good cause, the court may issue a subpoena prior to the trial directing any person other than the defendant to produce books, statements, papers and objects before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and the court may, upon their production, permit the books, statements, papers or

objects or portions thereof to be inspected, copied, or photographed by the parties and their attorneys."

The Revised Commission Comment discussing this section points out:

"The discovery allowed under subsection (d) is a two-part mechanism for gathering information. Under paragraph (1) either party may require a third person, other than the defendant, through the use of a subpoena (section 93-1501-3), to produce certain articles. The only restriction is that good cause must be shown. This allows what is sometimes referred to as a "fishing expedition" --- but only where third parties are concerned. * * *"

Section 95-1801(d)(2), provides:

"Upon motion of the defendant, within a reasonable time before trial, the court may, upon a showing of good cause, at a time and place designated by the court, order the prosecution to produce prior to trial for inspection, photographing, or copying by the defendant, designated books, statements, papers, or objects obtained from the defendant or others by the prosecution which are material, relevant and necessary to the preparation of the defendant's case."

The Revised Commission Comment as to this portion of the section states:

"The second paragraph permits discovery by the defendant or the prosecution with the additional requirement that the object desired must be "material, relevant and necessary to the preparation of the case."

This comment points out that the showing necessary to get access to material in the hands of the prosecutor is greater than is required to get at material in the hands of third parties.

Against this background, and with the recognition that in most criminal cases in Montana discovery is conducted on a more informal basis without resort to the motion and hearing procedures outlined above, this Court finds the allegation of error based on a delay of approximately a week in compliance with the demand made by defendant after the trial had begun, to be without merit.

Defendant claims that he had made two prior demands upon the county attorney for this material. These demands were in the form of letters to the county attorney. They made a number of specific requests and then made a general request for "* * * copies of any documentary or physical items which you will rely on for proof of any fact * * *." The second letter expressed the defense counsel's opinion that the state was not going to provide this information as requested. This letter was dated August 20, 1974. On January 13, 1975, after trial began, defendant filed a demand and motion requesting that all statements taken by the prosecution from all witnesses be turned over to defendant demanding immediate compliance. The court granted defendant's motion even it was not made "within a reasonable time before trial" as required by section 95-1801(d)(2), and stated:

> "Before a witness takes the stand, other than your foundation witnesses, that you [the state] are proceeding with now, furnish them [defense counsel] with such copies as you have that are not your work product as such, and before they [the witnesses] take the stand, he is going to be given an opportunity to talk with each witness, particularly those that have been endorsed just the other day * * *." (Bracketed material added).

The time it took for the state to gather, sort, and copy the requested material during the presentation of the state's case in chief was reasonable. The court prevented any prejudice by allowing defendant to interview the witnesses prior to their taking the stand. We note that the state complied with the specific requests made by defendant in the August letters, and that the reports received from the F.B.I. and the autopsy report were forwarded to the defendant soon after they were received and months prior to the August requests.

Defendant also alleges the addition of the names of 58 new witnesses to the Information on the day trial began was error.

The pertinent section of the Code of Criminal Procedure is section 95-1803(a)(1), which reads:

"(a) List of Witnesses:

"(1) For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of the court at the time of arraignment, a list of the witnesses intended to be called by the prosecution. The prosecution may, any time after arraignment, add to the list the names of any additional witnesses, upon a showing of good cause. The list shall include the names and addresses of the witnesses."

The Revised Commission Comment on this section points out:

"Section 95-1503 (d) of Chapter 15 requires the state to endorse the names of the witnesses for the state on the indictment or information. The motion under this section permits the defendant to get a list at any time, probably after arraignment and before trial. Many times the state does not know before it files the indictment or information all the witnesses it may call.

"Further, this provision allows the addition of names not only prior to trial, but after the trial has commenced. As the trial progresses, the showing which is necessary to establish 'good cause' should be more stringent. At any time, the judge may allow a continuance (section 95-1708) it if should appear necessary in the interest of justice."

In State v. Campbell, 160 Mont. 111, 500 P.2d 801, the person whose name was added was the victim of the assault and the Court there found no serious claim of surprise and pointed out that while defendant objected he made no effort to ask for a continuance. In State v. Rozzell, 157 Mont. 443, 486 P.2d 877, the district court judge recognized there was the possibility the witnesses that were added would surprise the defendant and offered to continue the trial until the defendant had had a chance to interview all the new witnesses, but this was refused.

These cases clearly indicate that the proper procedure where surprise is claimed from the addition of the new witness names is to ask for a continuance so that defendant may prepare. In the present case, defendant objected to the addition of the witnesses based on surprise and inability to prepare the defense but never requested a continuance. The district court in granting the state's request for the addition of the new witness names cautioned:

> "* * * and in granting this motion, it must be understood before any of these witnesses is allowed to testify, the defendant must be given an opportunity to have his counsel talk with them, examine them * * *."

The witnesses added were not prejudicial to defendant. The addition of the names of the F.B.I. agents did not surprise defendant, he knew the content of their testimony from the reports he had received several months earlier. All of the rest of the additional witnesses who were actually called to testify were employees of Wright Chevrolet. These persons' testimony was a part of the chain of possession of the evidence seized from the truck. The remainder of the witnesses whose names were added but who were not called to testify, were named because they could, if need be, corroborate the testimony of the already listed witnesses, lay further foundation, or testify about the weather and temperature in the area on the dates in question.

In its order, the court was careful to provide defendant with the protection against surprise and to ensure the defendant was able to prepare for the testimony. Defendant was in no way prejudiced by the addition of these witnesses. Before allowing the addition of the new witness names the court examined the county attorney to determine the reason for the

addition of each new witness and to find out the nature of each of the witness' testimony in the presence of defendant's counsel, so that defendant was apprised of the basic nature of the testimony.

Defendant alleges error because he had to make an out-of-order presentation of his case-in-chief during the state's case-in-chief.There is no question that the usual order of trial may be departed from in the proper case. Section 95-1911, R.C.M. 1947, states:

> "When the state of the pleading requires it, or in any other case, for good reasons, and in the discretion of the court, the order prescribed in the last section may be departed from."

We note that the artful phrase "good cause" is not used, rather there must be "good reasons" for the departure of the usual order of the trial.

Defendant's difficulty arose from the fact the F.B.I. agents who were to testify in this case were scheduled to testify in several other cases in other states and the judge would not require them to remain for the duration of the trial, nearly three weeks, unless there was good reason to keep them. The court requested defendant make an offer of proof to show why these persons should not be relased from their subpoenas after defendant opened his case-in-chief and examined them during the state's case-in-chief. Defendant argued that no reasonable offer of proof could be made until the completion of the state's case-in-chief. This may well have been true prior to enactment of the liberal discovery procedures in the Code of Criminal Procedure. In the present case, however, defendant had examined the F.B.I. reports; he had examined the physical evidence; and he had a list of the proposed exhibits that were to be put into evidence. If there was some reason to require the F.B.I. agents

to remain defendant would know it at the time of trial. No showing of such need was made and the judge in a proper exercise of his discretion and for good reasons allowed the agents to leave after they had testified as part of the defendant's case-in-chief, in the middle of the state's case-in-chief.

Defendant also objects that certain expert opinion was permitted to be given prior to the completion of the chain of possession of the evidence upon which this opinion was based. This again involves the F.B.I. agents. The judge allowed them to give their opinion as to the evidence they had examined, which had not as yet been admitted in evidence, because there was a portion of the chain of possession which had not been established. It is within the discretion of the court to allow pinion to be given, conditioned on the subsequent production and admission of the evidence which forms the basis of the opinion. Risken v. Northern Pac. Ry., 137 Mont. 57, 350 P.2d 831; Graham v. Rolandson, 150 Mont. 270, 435 P.2d 263. It is clear after a careful examination of the chain of possession of the evidence, that there was a proper basis for the admission of the evidence in this case. The necessary evidence which served to complete the chain of possession was supplied, thus there was no prejudice to defendant.

Defendant's specifications of error 12, 13, 14, 15, and 16 concern instructions. Defendant objects that the extensive preliminary instructions given by the court were in error, that it was error to give them prior to the introduction of evidence, that the remaining instructions given after the presentation of evidence were in error, and the court failed to give the jury verdict forms which covered all possible verdicts.

The preliminary instructions were the usual instructions given on the role of the jury. In addition, included were a number of instructions which set out the elements of the various crimes of which defendant was accused, and set out statutory definitions of terms used.

Montana's criminal code is written in clear plain language which serves well as the basis for instructions to the jury. There was no error in incorporating the entire Information into the preliminary instructions, for it too is basically in statutory language merely inserting the defendant's name and the victim's name in the proper places and enumerating the weapons used. The language is not inflammatory but is as neutral as language detailing the charges involved here can be. Examination of the instruction defining reasonable doubt and the burden of proof show proper statements of the law.

Defendant asserts that language in the instruction which defines the degree of proof necessary as being that which convinces the mind "to a moral certainty of the truth of the charge, no more and no less" falls into the type of error found in State v. Taylor, 163 Mont. 106, 515 P.2d 695. In Taylor, the state's burden was defined using the phrase "only such proof as may" which impliedly limits consideration of some of the evidence and which could be interpreted to limit the burden of proof. Here, the nature of the subjective judgment to be made by the jurors is being set forth and the language "no more and no less" merely emphasizes the nature of the judgment and in no way diminishes it.

The Court finds no error to the prejudice of defendant from the fact the extensive preliminary instructions were given prior to the introduction of evidence in the case.

Defendant concedes that section 95-1911, R.C.M. 1947 gives the court the power to vary the order of trial set out in section 95-1910, R.C.M. 1947, for good reasons. The present case was built entirely on circumstantial evidence. Some of the counts charged were complex and not easy to understand. For example, the second homicide count was a felony homicide which had as alternative felonies, sexual intercourse without consent and aggravated assault. The aggravated assault alternative had as alternate aggravating factors, serious bodily injury or bodily injury with a weapon, listing as alternative weapons a rope or a heavy object. It was for good reasons that the judge instructed the jury as to the basic elements of all the offenses charged, so the jury could have some understanding of the complex circumstantial evidence to be presented. In a less complex case which was not based only on circumstantial evidence, such preliminary instructions might not be necessary and there would not be the required good reasons for varying the usual order of the trial, but here it was acceptable to do so.

Defendant objects that the instruction defining torture incorrectly defines that term. The instruction states:

> "Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:
>
> "(a) extort anything from such person;
>
> "(b) or to persuade such person against his or her will, or
>
> "(c) to satisfy some other untoward propensity of the assailant * * *."

The term "untoward propensity" is defined in the same instruction as meaning "any perverse, wrong, bad or corrupt inclination or tendency."

A number of California cases have adopted a similar definition of torture.  People v. Daugherty, 40 Cal.2d 876, 256 P.2d 911, 917, states:

> "Murder is perpetrated by torture 'when "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion or to satisfy some other untoward propensity."  People v. Tubby, 34 Cal.2d 72, 77, 207 P.2d 51,54; People v. Bender, 27 Cal.2d 164, 177, 163 P.2d 8.'  People v. Martinez, 38 Cal.2d 556, 561, 241 P. 2d 224, 227."

The language of the instruction proposed by defendant is an exact quotation from the opinion of an earlier California case, People v. Heslen, 163 P.2d 21,27. See: 165 P.2d 250, 27 Cal.2d 520. That case dealt with the sufficiency of the evidence to support a finding of murder by torture and while there is no real conflict between the two instructions, the one given by the court is in the general language which does not comment on the evidence and which breaks the elements down and sets the various purposes out in the alternative for a clearer and more understandable statement of the law.  The instruction given is a proper one and certainly the better of the two proposed instructions. People v. Wiley, (Calif. Oct. 4, 1976) 554 P.2d 881.

Defendant objects to the remaining instructions given after the presentation of evidence.  Most of the objections are aimed at the method of proof of the state of mind element of the charges against the defendant.  It is clear that in the usual case the juror must rely on his normal mental processes to determine if the defendant did an act "purposely or knowingly". Here, the court in an extensive and thorough set of instructions outlined the normal course of the inferences that arise and how they arise and carefully defined the terms used in these instructions.

- 35 -

In this case, based as it was on circumstantial evidence entirely, it was proper to give these instructions.

Defendant argues the verdict forms provided the jury do not cover all the possible verdicts and that they amount to special verdicts.

Defendant submitted instructions and verdict forms which covered the offenses of mitigated deliberate homicide and unlawful restraint. It is clear, as stated in State v. Gray, 152 Mont. 145, 153, 447 P.2d 475:

> "'The submission of a lower offense is justified only when the evidence on some basis would support a finding that the defendant is innocent of the higher offense and guilty of the lower.'"

See also: State v. McDonald, 51 Mont. 1, 149 P. 279. In this case there was no such evidence and the instructions on the lesser offenses were properly not given.

The verdicts given the jury were general verdicts asking for a finding of guilty or not guilty and requesting the jury to make the additional finding that the element necessary for the imposition of the death penalty was present. This factual finding does not fall into the vice of a special verdict because it does not require a fact determination which could be used to undermine the jury determination.

Defendant claims error because his instructions were not given. Careful examination indicates for the most part, the subject matter of these instructions was covered by the court's instructions. Defendant's instructions on mental state and mental disease and defect misstate the law and the instructions on the elements of the crimes charged add an element that is not required.

In specifications of error 17 and 19, defendant makes an extensive attack on the Montana provisions for notice of mental defect or disease and the mental defect or disease provisions in the Code of Criminal Procedure, sections 95-501 through 509 and section 95-1803(d). These arguments were answered by this Court in State ex rel. Sikora v. District Court, 154 Mont. 241, 462 P.2d 897. This general broadside attack loses much of its force when it is recognized that the United States Supreme Court promulgated and Congress, after careful consideration, approved Rule 12.2, Notice of Defense Based on Mental Condition of the Federal Rules of Criminal Procedure which nearly is identical to the procedure attacked. It should be again emphasized the purpose of the statute is for notice and to prevent surprise and to eliminate the necessity for a continuance of a trial when the defense is raised. The fact of the notice does not amount to a plea and it could not be used in any way as evidence in the trial on the merits. The provisions merely provide for advance notice of the intent to rely on such defense so that the state may prepare.

State v. Olson, 156 Mont. 339, 480 P.2d 822, upheld the statutory section that places upon the defendant the burden to prove by a preponderance of the testimony the existence of mental defect or disease. In the instant case defendant was in no way prejudiced because none of defendant's instructions were refused based on a court finding that defendant could not meet this burden. State v. Bentley, 155 Mont. 383, 472 P.2d 864, found the reciprocity required. Indeed, under the Montana procedure in section 95-505(5) that requires a copy of the psychiatric examination be sent to counsel for the defendant, it is impossible to have

a secret rebuttal witness on this matter. Defendant knows who the state's witnesses are and through the report he knows the content of their testimony as well.

There is no need for fear of self-incrimination during the psychiatric examination, for section 95-509 protects the defendant if incriminatory information is gained during the examination.

Defendant refused to give the notice as required by the statute. He claims prejudice because he was not allowed to voir dire on the subject of mental defect or disease. However, at the time he wished to voir dire he had not complied with the notice and the issue could not at that time be presented to the jury. The court was correct in refusing to allow the voir dire.

Defendant alleges error because his expert on mental defect or disease was not allowed to be present during the state's presentation of its rebuttal experts on this matter. Earlier in the trial, defendant argued for a ruling from the court that rebuttal witnesses should be excluded from the courtroom during the presentation of the case. The judge ruled against this request. Defendant alleges this was an abuse of discretion to the prejudice of defendant. However, the state's witnesses finished at the end of the day and defendant's rebuttal began the next day. There was time to inform the defense expert of any additional information not in the report made by these experts, which the defense already had, and to prepare the rebuttal testimony. There was no prejudice from this minor inconsistency on the part of the judge.

The alleged error in filing the fourth Information is without merit. The filing follows the directions set out by this

Court in State ex rel. McKenzie v. District Court, 165 Mont. 54, 525 P.2d 1211, therefore there was no error in the Information or its filing.

Defendant was not denied his right to a speedy trial. While it is true that approximately 350 days elapsed between the filing of the charges and the beginning of trial, that was a long enough period to shift to the state the burden of explaining the delay and showing the the absence of prejudice. Fitzpatrick v. Crist, 165 Mont. 382, 388, 528 P.2d 1322; State v. Keller, _____Mont._____, 555 P.2d 1013, 33 St.Rep. 795,798. The state's explanation for the delay, which included defendant's several appearances in this Court, the difficulties arising from the defendant's refusal to plead, the difficulties which arose because this was the first homicide committed under the new Montana Criminal Code and under the new capital punishment scheme, is satisfactory to this Court. Much of the time can in fairness be charged to neither party, but it is clear that it aided both parties to better prepare for the trial, this being a complex circumstantial case. This advantage outweighs any anxiety defendant might have suffered.

Defendant asserts error in the trial court's Findings, Conclusion, Sentence and Order. The errors referred to are essentially clerical errors in the body of that document. A mistaken citation of the subsection letter in section 94-5-105, R.C.M. 1947, which was caused by the amendment which numbered the section is an example. This document is not in error in respect to the factual or legal basis of any of its findings and this Court finds no prejudice in the clerical errors.

Finding no reversible error, the judgment is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____
Hon. Jack Shanstrom, District
Judge, sitting for Justice Gene B.
Daly.

. . . . . . . . . . . . . . .

Mr. Justice Frank I. Haswell concurring:

I concur in the result reached by the majority. However, with respect to the issue of the constitutionality of the death penalty, the majority opinion relies too heavily on tenuous analogy to the statutory schemes of other states analyzed in Gregg v. Georgia, 44 U.S.L.W. 5230; Proffitt v. Florida, 44 U.S.L.W. 5256; and Jurek v. Texas, 44 U.S.L.W. 5262, all decided July 2, 1976. In my view the precise application of Montana statutes to the imposition of the death penalty is left in a dense fog. This concurring opinion attempts to describe the constitutional application of the Montana statutes.

The cumulation of majority opinions in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L ed 2d 346 (1972), led to considerable confusion among the several states' legislatures

- 40 -

which desired to retain a constitutionally viable death penalty.
In some jurisdictions Furman was read as requiring a strictly
mandatory death sentence for certain classes of proven crimes.
This view was laid to rest by the decisions in Roberts v. Louisiana,
44 U.S.L.W. 5281, and Woodson v. North Carolina, 44 U.S.L.W. 5267,
(both decided July 2, 1976), and by this language in Gregg at
pp. 5240 and 5242, 44 U.S. L.W.:

> "Furman mandates that where discretion is afforded
> a sentencing body on a matter so grave as the
> determination of whether a human life should be
> taken or spared, that discretion must be suitably
> directed and limited so as to minimize the risk of
> wholly arbitrary and capricious action.

> "* * *

> "In summary, the concerns expressed in Furman that
> the penalty of death not be imposed in an arbitrary
> or capricious manner can be met by a carefully
> drafted statute that ensures that the sentencing
> authority is given adequate information and guidance.
> As a general proposition these concerns are best met
> by a system that provides for a bifurcated proceeding
> at which the sentencing authority is apprised of the
> information relevant to the imposition of sentence
> and provided with standards to guide its use of the
> information." (Emphasis supplied).

Thus, statutory schemes which impose the death penalty in
a wholly mandatory or wholly discretionary fashion do not pass
constitutional muster. I believe the Montana laws effective at the
date of the crimes in the instant case are in that constitutionally
permissible middle ground between unbending mandatory death sentences
and unbridled discretion in the imposition of death sentences.

To ensure that death sentences are not "wantonly" or
"freakishly" imposed (Furman v. Georgia, 408 U.S. 238,310) the
United States Supreme Court in its most recent pronouncements on
the subject, seems to have established three general criteria
which are requisite to a valid death penalty statutory scheme. See
e.g., Jurek v. Texas, 44 U.S.L.W. 5262, 5266.

First, there must be at least one statutory aggravating circumstance before a death sentence may even be considered. Second, the defense must be afforded the opportunity to bring before the sentencing body at a separate sentencing hearing any mitigating circumstances relating to the individual defendant. Third, there must be available prompt judicial review of the sentencing decision by a court of statewide jurisdiction, providing a means to promote the evenhanded, rational, and consistent imposition of death sentences under law.

The death penalty statutes under attack in the instant case, sections 94-5-105 and 94-5-304, R.C.M. 1947, as they existed at the time of the crimes, satisfy the first criterion set forth above. The death sentence cannot be imposed unless one of six aggravating circumstances is found by the trier of fact to exist. The majority opinion herein adequately shows that this condition was found in the instant case.

The second criterion, that mitigating circumstances be reviewed at a separate sentencing hearing, is satisfied by two separate statutory provisions: First, both death penalty statutes provide that the court "shall" impose a sentence of death "unless there are mitigating circumstances". Defendant urges that the "unless" clause may purport to circumscribe the sentencing judge's authority, but that there are no guiding standards nor sources of information provided for. This argument ignores the second statutory provision relevant here, that is, the presentence investigation and report provisions. Section 95-2203, R.C.M. 1947, requires a written presentence investigation report to be delivered to and considered by the sentencing court in felony cases. Section 95-2204, R.C.M. 1947, provides the report shall contain information

respecting "the characteristics, circumstances, needs, and potentialities of the defendant; his criminal record and social history; the circumstances of the offense; * * * and the harm to the victim, his immediate family, and the community." The report provides the sentencing authority with whatever circumstances may exist in mitigation of the defendant's conduct.

Reading the two provisions together, the sentencing court is required to consider mitigating circumstances, and is required to consider the presentence investigation report which must contain any matters relevant to mitigation. In addition, all sentencing courts are directed by section 95-2201, R.C.M. 1947, to perform their sentencing functions "to the end that persons convicted of a crime shall be dealt with in accordance with their individual characteristics, circumstances, needs and potentialities". This mandates the imposition of sentences which are not disproportionate to the severity of the crime. Finally, the defendant is authorized to seek a hearing to present to the court his testimony and evidence in mitigation of punishment.

Prompt judicial review of death sentences is provided for by appeal to this Court, as well as appeal to the Sentence Review Division. This Court determines the legality of the sentence imposed, State v. Simtob, 154 Mont. 286, 462 P.2d 873, while the review division is designed to determine the appropriateness of the sentence with respect to the individual offender and particular offense.

In summary, although Montana's statutory scheme is unlike those approved by the United States Supreme Court in Gregg, Proffitt and Jurek, I can see no substantive failure of Montana's statutory

scheme to comply with constitutional standards. Our system is
neither wholly mandatory nor wholly discretionary. There are
precise statutory requirements for finding aggravating and
mitigating circumstances, and a procedure for flushing out the
facts with respect to such circumstances. There is appellate
review at two levels, insuring that the sentence is both legal
and proportional to the nature and class of the crime. In short,
I believe that the statutory scheme in existence at the time of
the crimes herein, affords defendant the procedural safeguards
necessary to protect his substantive right to be sentenced
without arbitrariness or caprice.

_____
Justice.

Honorable Robert J. Boyd, District Judge, sitting for Justice
Wesley Castles, dissenting:

While I concur with much that has been said by the
majority of the Court in affirming the conviction of the defendant,
I must respectfully dissent from the majority in sustaining the
lower court in the matter of the admission into evidence of plaintiff's
exhibits numbered 6 through 11 which was specification of error
number 4 in the appellant's brief.

Plaintiff's exhibit number 6 was a colored photograph
of the victim's body taken at the place of discovery. Plaintiff's
exhibit number 7 was a colored enlarged close-up of the victim's
face. Plaintiff's exhibit number 8 was a black and white autopsy
photo of the victim's face. Plaintiff's exhibit number 9 was an
eight by ten autopsy photo of the victim's face showing the head
partially shaved with gaping wounds.

Exhibit number 10 was a black and white autopsy photograph
showing the shaved skull and gaping wounds. Plaintiff's exhibit
number 11 was a black and white autopsy photo showing the bloody
face of the victim with brain tissue protruding from the wound.

At the outset it is noted that there was no issue for the
jury as to the fact of death or the identity of the victim for
this had been stipulated by and between counsel. The majority
recognizes the requirements laid down in Fulton v. Chouteau County
Farmers' Co., 98 Mont. 48, 37 P.2d 1025, and State v. Bischert,
131 Mont. 152, 308 P.2d 969, of "relevance" and "necessity", but
then completely ignores the testimony of Dr. John Pfaff that he
could render his opinion without reference to the photographs.

The photographs were admittedly gruesome and the court was therefore placed into the unenviable position of weighing the probative value of the offered photographs with the affect that the photos were bound to have on the jury. This is particularly so of exhibits 9 and 10 which were taken during the autopsy by Dr. John Pfaff and after the head of the victim had been shaved. These were admitted even though Dr. Pfaff had testified:

"Q. (By Mr. Reagan) Dr. Pfaff, you did conduct this autopsy? A. Yes Sir.

"Q. And you are here prepared to testify in this Court to this jury as to the results of your autopsy? A. Yes.

"Q. And you are prepared to render certain opinions based upon your expertise, and your autopsy, as to the injuries suffered and the cause of death? A. I am.

"Q. And is it possible for you to so testify and render those opinions in this court today without these photographs? A. It is possible for me to, yes sir.

"Q. And you would be able to do so? A. To the best of my ability.

"Q. And you would, without the photographs, be able to testify and render an opinion as to the type and scope of the injuries and to the probable cause of death? A. I can testify to the best of my ability in answer to the questions that are put to me.

"Q. The point I am trying to make, you have observed the wounds? A. Yes sir.

"Q. And based upon your observation of those wounds and other tests conducted by you, you are prepared to render an opinion as to the cause of death? A. I am.

"Q. And to do that, you could do that without the use of those photographs? A. I could do that without these photographs.

'MR. REAGAN: Objection to these photographs, not only based upon all of the objections he listed in P6, but further grounds these particular photographs are gruesome and not necessary for the purpose of eliciting the testimony from this particular witness.

"THE COURT: Overruled; he may answer. The exhibit may be admitted."

- 46 -

It is apparent from the holding of this Court in <u>Bischert</u> that if the pictures of a homicide victim made subsequent to death are gruesome or ghastly and carry danger of prejudice, they are inadmissible unless they are relevant to some material issue and would reasonably assist the jury in the determination of the defendant's guilt, and this relevancy must outweigh the danger that the jury would substitute emotion for reason for a basis of its verdict.

In the case at bar, there was no reason for the introduction of the photos, there was no issue or controversy as to the cause of death. Additionally, the photographs taken during the autopsy reveal matters such as the shaved head of the victim which were not the handy work of the defendant, and could under the circumstances serve no other purpose than to arouse the emotions and passions of the jury.

As stated in <u>Bischert</u>, 131 Mont. 152, 160:

> "Here, where the pathologist was fully able to explain his findings without the use of the photographs, their purpose could only arouse the human feelings of the jury without aiding them in further understanding of the crime charged."

I would hold that the trial court abused its discretion in the admission of these photographs and by reason thereof prejudice resulted and a reversal should be had.

Hon. Robert J. Boyd, District Judge, sitting for Justice Wesley Castles.